CASE 72.—ACTION BY A. J. McDANIEL AGAINST ·ROUNDS BROS.—May 4, 1909.   ·

# Rounds  Bros. v. McDaniel

Appeal from Daviess Circuit Court.

T. F. BIRKHEAD, Circuit Judge.

Judgment for  plaintiff. Defendant appeals.—Reversed.

1. Parent and Child—Wages of Child—Recovery by Parent—Expenses.—Where the father of a nonemancipated minor sues to recover wages, the child's employer is entitled to have deducted from the recovery sums paid for board and clothes not furnished by the father.

2. Parent and Child—Duty to Support.—A parent is bound by positive law to protect, educate, and support the child.

3. Parent and Child—Earnings of Child—Rights of Parent.—A parent, being legally bound to support his child, is entitled to the child's services and earnings during minority.

4. Parent and Child—Earnings of Child—Rights of Father—Relinquishment.—A parent may lose his right to his child's earnings by failing to provide ·a home for his child if he is able to do so by such cruel conduct, ill treatment, or neglect as forces the child to abandon his home ·by becoming so· degraded or dissolute that ˙his child cannot in morals or decency live with him or ·by emancipation.

5. Parent and Child—"Emancipation"—"Express  Emancipation." "Implied Emancipation."—"Emancipation" of a child is the relinquishment by a parent of control and authority over his child conferring on the child the right to his earnings and extinguishing the ·parent's legal duty to maintain and support the child. Emancipation is "express" when the parent voluntarily agrees with the child, who is able to take care of and provide for himself, that he may go from home, earn his own living, and control his earnings, or when the father voluntarily transfers the custody and keeping of the child to another. An express emancipation cannot be renounced by the  parent. An "implied emancipation" results where the parent, ·by his acts or conduct, impliedly consents that the minor may leave home and shift for himself; the father, under those circumstances, however, being authorized to renʹounce the same within a reasonable time.

6. Parent and Child—Emancipation—Revocation.—A child· having reached the age when he could make ˙his own living, the father consented in 1902 that he might leave home and con-

Rounds Bros. v. McDaniel.

tinue in his employment. For nearly two years thereafter the child so remained with the father's knowledge and consent, during which time he received his own wages and disposed of them as he desired. The father did not object to the employment nor demand his wages until 1906, nor did he request the child to return to his home. Held, that the father's delay barred his right to revoke the implied emancipation thereby established.

SWEENEY, ELLIS & SWEENEY for appellant.

SYNOPSIS OF POINTS DISCUSSED AND AUTHORITIES.

1. Demurrers to petition good. Schouler on Domestic Relations, Sec. 264; Blackstone 453; American & English Enc. 2 Ed. Vol. 21 p. 1039; Jones v. Tevis, 4th Littell 25.
2. Father never supported boy nor objected to Rounds Bros. paying him his wages.
3. State concerned in the decision of this case.
4. Short review of lower court's opinion, which will show how wrong the court got on the law.
5. The rule of law applicable to these cases correctly stated. Schouler on Domestic Relations, Secs. 233, 236, 237, 241, 243, 252, 453; 21st American & English Enc. 2 Ed. 1039; Jones v. Tevis, 4th Littell 25; Nightingale v. Wethington, 8 Am. Dec. 101; Woodell v. Cogeshall, 31 Am. Dec. 391; Kelly v. Davis, 49 N. H. 187; Whitting v. Earl, 15 Am. Dec. 207; American & English Enc Vol. 21, 2 Ed. pp. 1041-1042. Kentucky Statutes, sections 325, 329, 331 and 2008.
W. E. AUD for appellee.

LIST OF AUTHORITIES RELIED UPON.

1. Right of a father to recover the wages of his child. Blackstone Vo. 1 page 447; Blackstone Vol. 1 page 447; Blackstone Vol 1 page 453; Blackstone Vol 1 page 453; Kents Commentaries Vol. 11 page 192; Jones & Gulley v. Tevis, 4 Littell R. 27; L. & N. R. R. Co. v. Willis, 83 Ky. page 60; Soper v. Ivo Walker & Co., 28 Ky. 519; Washburn v. Abran, etc., 28 L. R. page 985.
2. Emancipation. 21 American & Eng. Encyclopedia of Law 1160 2nd Add.

OPINION OF THE COURT BY JUDGE CARROLL—Revering.

This case presents the interesting question: What acts and conduct of a father will constitute an emancipation of his minor child so as to deny the father the right to recover the child's wages during his minority?

The mother of Byrne McDaniel died in 1900, when he was about 12 years old, leaving his father, the appellee, A. J. McDaniel, with six children to care for. The father, who was a poor but kindly disposed man, a carpenter by trade, did not own any property, and found it necessary to place the other children—all of whom were younger than Bryne—in orphan homes, but after doing so he aided in their support. After this the father and Byrne boarded with a sister of the father, and for two or three years thereafter Byrne worked at different places, earning a few dollars a week, which he contributed towards his support. In 1902 Byrne, who was then about 14 years old, commenced to work for appellant, Rounds Bros. They paid him small wages in the beginning, but, finding him to be an industrious, sober, well-behaved, and capable boy, gradually increased his compensation, until at the time this suit was brought in 1907 he was receiving some $8 or $10 a week. During the first two years that he worked for them he lived with his father at his aunt's and contributed all or the greatest part of his wages towards paying for his board and clothing. In 1904, Byrne becoming dissatisfied with the accommodations received at his aunt's, left her house and procured board and lodging elsewhere. The evidence does not disclose any substantial reason why Byrne left the home of his aunt, but he assigned as a cause for so doing that the accommodations there were not as comfortable as he desired, and that he could not get his meals when he wanted them. After he left his father did not contribute anything toward his support or maintenance or expend anything in his behalf. In fact, he did not, after leaving his aunt, need the assistance of his father, as he was earning sufficient money to take

care of himself. His father did not object to his leaving home, nor did he make any provision or arrangement for another home for him, although it cannot be said that his acts or conduct or treatment of Byrne furnished any sufficient reason why Byrne should have abandoned the home provided for him by his father. His father was at all times aware of the fact that Byrne was working for the Rounds Bros., and knew that from 1904 to 1906 they paid him his wages, and that he was expending them for his own use and benefit; but he did not object or make any demand that the wages be paid to him until April, 1906, when he notified Rounds Bros. that they must pay him what the boy earned. This they declined to do, and in 1908, he brought this action to recover the amount Byrne earned after he notified the Rounds Bros. to pay the wages to him. The lower court rendered a judgment in favor of the father against the Rounds Bros, for the amount of the boy's wages after the notification, less the sum expended during this time by Byrne for board and clothes. It may be here stated that, if the father had not emancipated his son and was entitled to his wages, no just complaint could be made of the judgment. Having the view the lower court did of the law of the case, it was correctly held that there should be deducted from the wages received by the son the amount necessary to defray his expenses. Culberson v. Alabama Construction Co., 127 Ga. 599, 56 S. E. 765, 9 L. R. A. (N. S.) 411, 9 A. & E. Ann. Cas. 507. From the judgment the Rounds Bros. prosecute this appeal, and ask a reversal upon the ground that the father had emancipated his son, and therefore was not entitled to recover his wages, and in this insistence they are joined

by Byrne. The father's contention is that the facts before stated are not sufficient to amount to an emancipation of his son, and consequently he was entitled to recover from Rounds Bros. the boy's wages after he notified them that he claimed them. He also makes the further point that even if it should be held that, by permitting his son to leave home and earn his own living, he impliedly emancipated him, yet he had the right at any time during the child's minority to revoke this constructive emancipation and resume parental control and authority, and that, after he had so revoked it by notifying the Rounds Bros. that he claimed his son's wages, the status of parent and child was re-established the same as if there had never been any emancipation.

We have in this state no statute upon the subject under consideration, nor has the question ever been directly decided by this court; but the subject of parent and child, and the reciprocal rights, duties, and obligations of each, has furnished so much interesting matter for text-book writers, and has so frequently been considered by courts of other jurisdictions, that there is ample precedent and authority, both ancient and modern, from which to gather and formulate the general rules of law applicable to this relation. But this case presents some features of the law that are not so well settled, and concerning which there is conflict of authority. The duties and obligations of parent and child are, in a sense, at least reciprocal. Upon the parent is imposed by nature, as well as law, the obligation of supporting and caring for his offspring. As said by Blackstone (volume 1, p. 447): "The duty of parents to provide for the maintenance of their children is a principle of natural

law; an obligation, says Puffendorf, laid on them not
only by nature herself, but by their own proper act,
in bringing them into the world, for they would be
in the highest manner injurious to their issue, if
they only gave their children life that they might
afterwards see them perish. By begetting them there-
fore they have entered into a voluntary obligation
to endeavor, so far as in them lies, that the life which
they have bestowed shall  be supported  and  pre-
served." In Schouler on Domestic Relations, p. 415,
it is said: "Three leading duties of parents as to
their legitimate children are recognized at the com-
mon law: First, to protect; second, to educate; third,
to maintain them. These duties are all enjoined by
positive law, yet the law of the natural affection is
stronger in upholding such fundamental obligations
of the parental state." From this duty resting upon
the parent comes the right to the services of the
child during his minority, intended to be at least in
some measure compensation for the care and atten-
tion bestowed upon the child in infancy; and this right
of the parent to the services of the child during his
minority is everywhere recognized.  Jones v. Tevis,
14 Ky. 25, 14 Am. Dec. 98; L. & N. R. R. Co. v. Willis,
83 Ky. 57, 6 R. 784, 4 Am. St. Rep. 124; Illinois Cen-
tral R. Co. v. Henon (Ky.) 68 S. W. 456, 24 R. 298;
Blackstone, Commentaries, vol. 1, p. 454; Schouler
on Domestic Relations, p. 334; Tyler  on Infancy &
Coverture, p. 200; 29 Cyc. 1623; 21 Am. & Eng. Ency.
of L. p. 1039.

It is equally well settled that the parent, although
entitled to the services and earnings of his minor
child, may relinquish or surrender this right: First,
by failing to provide for his child a home if he is

able to do so; second, by such ill treatment, neglect, or cruel conduct as forces the child to abandon his home; third, by becoming so degraded or dissolute a character that his child cannot in morals or decency live with him; and, forth, by emancipating his child. And if, in this case, the father had failed to provide a reasonably comfortable home for Bryne, or if he had treated him in a cruel or inhuman manner, or if he had so grossly neglected his parental duties as to cause him to leave his home, or if his life was so unworthy or discreditable that his son could not in decency or self-respect longer continue to recognize his authority, we would have little difficulty in reaching the conclusion that the father could not, after driving him away, or by his acts or conduct forcing him to shift for himself and make his own living, thereafter lay claim to his earnings. All the books are agreed upon this point, and indeed, in the absence of authority, we could have no doubt that under a state of case like this the father could not have the assistance of the courts to aid him in securing the services or wages of his child whom he had compelled by neglect, cruel treatment, or dissolute habits to secure another home. 29 Cyc. p. 1627; Godfrey v. Hays, 6 Ala. 501, 41 Am. Dec. 58; Nightingale v. Withington, 15 Mass. 272, 8 Am. Dec. 101; Swift & Co. v. Johnson, 138 Fed. 867, 71 C. C. A. 619, 1 L. R. A. (N. S.) 1161; Tyler on Infancy & Coverture, p. 200. But the facts of this case do not warrant us in putting our decision upon any of these grounds, and so, if the judgment below is to be reversed, it must be because the father had emancipated his son. The doctrine of "emancipation," looking at it from a legal standpoint, is a recognition of the right of the parent to relinquish

control and authority over his child to whose custody and service he is entitled; or to surrender, if he so elects and desires, to his minor son, who is capable of making his own living, the right to do so, and the privilege of receiving the wages that he earns. When this right of emancipation has been granted, it follows as a matter of course that the person for whom the child labors may pay him his wages, and that the child may do with them as he pleases. In other words, when a child has been emancipated, he occupies the same legal relation towards the parent as if he had arrived at full age. The legal duty of the parent to maintain and support him and defray his necessary expenses is extinguished, and so is the right of the parent to claim the services and wages of the child.

There are two kinds of emancipation that may be termed "express" and "implied." We should say that an "express emancipation" takes place when the parent freely and voluntarily agrees with his child, who is able to take care of and provide for himself, that he may go out from home and earn his own living and do as he pleases with his earnings, or when he willingly transfers to another the custody and keeping of his child without reference to his age. Where the emancipation is expressly agreed upon, the parent cannot afterward renounce or set aside the agreement. He is bound by it to the same extent as he would be by any other contract freely entered into. The parent cannot, after deliberately surrendering parental control or relinquishing the right to another, reclaim the services of his child. An "implied emancipation" results when the parent, without any express agreement, by his acts or conduct impliedly consents that his minor son may leave home

Rounds Bros. v. McDaniel.

and shift for himself, have his own time, and the control of his earnings, and it may be inferred from and shown by circumstances. But where the child leaves home and goes out to make his own living under the assumption that his parent has emancipated him, his rights to his services and earnings are not absolute, as in the case of an express emancipation, and the parent may, by taking timely action, resume parental authority and reclaim the services of his child, but he must not delay until his implied emancipation has ripened into an express relinquishment, or wait until it would be hurtful to the best interest of the child to interfere with his individual aims and plans. It should, however, be kept in mind that whether or not the father emancipates his minor child rests with the father, and not with the child. The father may by his acts or conduct relinquish parental control and authority, but the child of his own volition, in the absence of mistreatment or other like cause, cannot sever the relation so as to deny the father the right to his services and wages during his minority.

Contenting ourselves with these broad statements of general principles, we will proceed to inquire whether the facts of this case authorize us in holding that the father had emancipated his son. After Byrne had reached an age when he could make his own living, and was mentally and physically able to do so, his father voluntarily consented that he might leave his home, and continue in the employment of the Rounds Bros. for whom he had been working, and for something like two years he remained in their services, with the knowledge and consent of his father. During this time he received his own wages,

and made such dispositon of them as he desired. That
he was an industrious, economical ,and' capable boy,
there is abundant evidence.   He had the respect and
confidence of his employers, and in a business way
was rapidly advancing.   His father did not object to
his employment until 1906, or demand his wages.
until that time.   He did not request him to return to
his home, nor did he manifest any particular interest
or concern in his welfare.   He seemed to recognize
that his son was well situated and comfortably pro-
vided for, and that his usefulness was being promoted
by the service he was engaged in and the interest his
employers were manifesting in his welfare, and so he
was willing to give him an opportunity to make his
own way in the world.

In our opinion these facts were not sufficient to
establish an express emancipation such as the parent
could not afterwards revoke or set aside; but they
do show the son left home under circumstances that
amounted to an implied emancipation. But when the
appellee attempted to resume parental control and
authority after the expiration of more than a year,
it was too late to reclaim the right.   In this time the
interest and welfare of the child had become an im-
portant factor in determining the rights of the
parties.   In judging a case like this, the court will
not look exclusively to the rights of the parent, but
will consider what is best for the child.   The father
when his child was in some measure at least a bur-
den to him, voluntarily allowed him to go out and
care for himself, and after the child, prompted by
prudent and industrious motives, had became more
than self-sustaining, sought to withdraw the consent
he had given.   To permit him to do so would, under

the circumstances of this case, be detrimental to the best interest of the child. To deprive the boy of his wages or force him to abandon his employment would seriously check his aspirations and impair, if not destroy, the fine prospects for future success that were opening up to him by reason of his attentive, honest, and sober habits.

We do not wish to extend this doctrine of implied emancipation to cases which do not justify its fullest application, and do not mean to hold that every time a child who is old and strong enough to work becomes tired of or dissatisfied with his home he may leave, although without objection on the part of his parents, and live at some other place and work for other persons, and thereby sever the obligation he owes to his parents and destroy their right to his services and wages. Minor children cannot in this way cancel the duty they are under to the parent, who by acting promptly may reclaim the services of the child and the right to his earnings; but the parent must interpose his authority within a reasonable time. When a father gives freedom to a grown boy and tells him, in effect, if not in words, to go out and make his own living, and be his own man, and the boy acting on this implied consent or direction does commence for himself the battle of life, and is successfully meeting all its requirements, the father will not, unless he acts in seasonable time, be permitted to reclaim the boy's services or resume the parental authority he surrendered.

The conclusion we have reached finds support in the following authorities: In Abbott v. Converse, 4 Allen (Mass.) 530, the court said, in considering a similar question: "The basis of the father's right to

the services of his children is his duty to support and educate them; but this duty is subject to many modificaltions growing out of the circumstances and conduct of the parties, and the right is not absolute or inalienable. It may be forfeited by misconduct, but cases may arise where the forfeiture would be held to be temporary. The cases referred to establish the doctrine that it may be transferred to the minor. It is to be regarded as being in the nature of property, and, as a minor may hold other property independently of his father, there seems to be no valid reason why he may not thus hold the right to his own time and earnings. As he may hold it by a contract with his father under seal, or for a valuable consideration, there. is no more reason for holding that the father may revoke this contract, at his pleasure, than any other contract. On principle he should be as fully bound by it as by a conveyance of land or other property to his child. As it may be held by gift or license without any consideration, there is no reason why the gift, when accepted, should be any more revocable, without the consent of the donee, than any other gifts.''

In Nightingale v. Withington, 15 Mass. 272, 8 Am. Dec. 101, Chief Justice Parker said: ''But where the falther has discharged himself of the obligation to support the child, or has obliged the child to support himself, there is no principle, but that of slavery, which will continue his right to receive the earnings of the child's labor. Thus, if the father should refuse to support a son, should deny him a home, and force him to labor abroad for his own living, or should give or sell him his time, as is sometimes done in the country, the law will imply an emancipation of the son, and although it will not enable him to contract to his

prejudice, it will give him the benefit of such contracts as are made with him for his services, and a payment to the son, in such circumstances, will be a good discharge of such contract.''

The same learned judge, in Whiting v. Earle, 3 Pick. (Mass.) 201, 15 Am. Dec. 207, said: ''Although the general principle is clear that a father is entitled to the earnings of a son while under age, yet the court thought it equally clear that he might transfer to the son the right to receive them. This is necessary for the encouragement of young men, and it is often convenient for a father, wishing to be relieved from the burden of supporting his son, to allow him in this manner to support himself. Where such a contract is entered into without any fraud, for the advantage of the son, on the principles of common justice, and according to decided cases, he is entitled to the profits of his own labor. We go so far as to say that where a minor son makes a contract for his services on his own account, and the father knows of it and makes no objection, there is an implied assent that the son shall have his earnings.'' To the same effect is Morse v. Welton, 6 Conn. 547, 16 Am. Dec. 73; Wodell v. Coggeshall, 2 Metc. (Mass.) 89, 35 Am. Dec. 391.

In Beaver v. Bare, 104 Pa. 58, 59 Am. Rep. 567, the court said: ''The exercise of parental authority is not necessarily for the profit of the parent, but for the advantage of the child; the duty of service by the child being deemed necessary to the proper exercise of parental authority for its own good. Although we still recognize, the right of the father to the personal services of his children, that right is simply incidental to the duty of the father to discipline and

direct them. His right to personal custody and per-
sonal service is secured to him therefore in order that
through them, prompted by natural affection, he
may successfully impart to them habits of industry,
methods of thrift, and the means of personal success
in life. * * * The right to their service being mere-
ly for their good, whenever the father finds their in-
terest, or his own, better subserved by their emanci-
pation, he can liberate them.''

In Schouler on Domestic Relations, p. 346, it is
said: ''The father may by his own delay forfeit the
right of action for his son's wages; as where the
minor agrees to work at certain monthly wages to be
paid to himself, and the father, knowing of the agree-
ment, gives no notice of his objection, but waits until
the work has been done and payment is made to the
child, before making a demand. But if the father has
given seasonable notice of his dissent and demand to
the stranger hiring his son, the fact that the son con-
tinues to work against his express dissent, and that
the stranger notified him to come and take his son
away, and he neglected to do so, will not preclude him
from recovering the wages.'' And so on page 370 the
learned author says: ''It is a well-settled rule in this
country that if the parent absconds, turns his child
out of doors, or leaves him to shift for himself, the
son in entitled to his own wages and our courts are
very liberal in allowing children to avail themselves
of any breach of parental obligation so as to earn an
honest livelihood by their own toil. The presumption
raised in such cases may be termed a presumption of
necessity. So where the husband abandons his child
to the care of his mother, his subsequent claims for
the earnings of either are to be regarded with very

little favor. Even slighter circumstances, which impute no misconduct to the father, but evince a consent for his son to leave the parental roof and go into the world to seek his own fortune, are often construed into emancipation.''

In L. & N. R. R. Co. v. Davis (Ky.) 105 S. W. 455, 32 R. 306, which was an action by the father to recover damages for a personal injury sustained by his minor son while in the employment of the railroad company, the court said: ''Assuming that the boy was under 21 years of age, did his father consent or acquiesce in his employment? It may be admitted at the outset that the father did not know of the original employment, but his own testimony shows that, while his son was engaged at work on the railroad in making a fill, the father went out to where he was at work and saw him performing the duties of his employment. The father talked to the foreman, whom he told the boy was only 16 years of age, and upon the foreman's saying in reply that he hated to give him up, he was such a good boy, the father left without saying more, and went home. *  *  *  Afterwards the father testified that his son came home on Sunday and then went back to work and the evidence shows without contradiction that the boy was paid off several times before he was hurt. During all the time the father lived within 2½ miles of where his son was working in the employ of the railroad, and made no protest or objection to his remaining at work on the fill. We think that this was a consent on the part of the father to the employment of his son by the appellant. He had no right, if he objected to the employment, to remain silent about it until his son was hurt, and then complain that the employment was without his consent. He allowed the

boy to draw his own wages, and it does not alter the case that the money was delivered to the father.  If the father allowed the boy to keep the money, this was a practical manumission of him.  If he required him to bring it home, this was a ratification of the employment.''

After carefully considering this case, our conclusion is that the father was not entitled to the wages earned by his son, and therefore, the whole court sitting, the judgment is reversed, with directions to dismiss the petition.