[No. 2451]

## W. E. GOLDSWORTHY, APPELLANT, v. D. S. JOHNSON, RESPONDENT.

[204 Pac. 505]

1. APPEAL AND ERROR — CORRECT JUDGMENT NOT REVERSED FOR ERRONEOUS REASON.

If the judgment is right on any theory, it will not be reversed, though the trial judge rendered it on an erroneous theory.

2. HUSBAND AND WIFE — WORDS "ALLOW" AND "APPROPRIATE TO HER OWN USE" NEED NO CONSTRUCTION.

In Rev. Laws, 2169, providing that, when the husband has allowed the wife to appropriate to her own use her earnings, they are her separate property, the words "allow" and "appropriate to her own use" are to be given their everyday ordinary meaning which a layman would attach to them, and call for no construction or interpretation.

3. HUSBAND AND WIFE — EVIDENCE HELD TO SHOW WIFE APPROPRIATED EARNINGS TO HER OWN USE.

Evidence that a wife went to another city when her husband was unemployed and there obtained employment, and that after paying her living expenses she deposited the surplus of her earnings in her name in a savings account and subsequently used it for the purchase of Liberty bonds, held to show that the wife had appropriated her earnings to her own use.

4. HUSBAND AND WIFE — HUSBAND ALLOWS WIFE TO APPROPRIATE EARNINGS BY NOT EXERCISING CONTROL OVER THEM.

Since Rev. Laws, 2160, gives the husband the entire management and control of the community property, the fact that the husband failed to exercise the active control and management thereby vested in him over the earnings of his wife, permitting her to use them as she chose without objection or question, shows he allowed her to appropriate them to her own use so that they became her separate property, under Rev. Laws, 2169.

5. GIFTS—ESSENTIALS OF "GIFT CAUSA MORTIS" STATED.

The essentials of a "gift causa mortis" are that it be made in anticipation of the near approach of death, by an actual or symbolical delivery by the donor, or at his express request, of personal property to the donee, or to some one in his behalf, subject to the right in the donor, implied by law, to revoke the gift in case of his recovery.

6. GIFTS—LAW DOES NOT LOOK WITH DISFAVOR ON GIFTS CAUSA MORTIS.

Though gifts causa mortis are closely scrutinized because of the ease with which fraud may be perpetrated, and must · be established by clear, convincing, and satisfactory proof, the courts regard such gifts when so established with as much favor as they do a bequest or a devise under a will.

7. GIFTS—SYMBOLICAL DELIVERY SUSTAINS GIFT CAUSA MORTIS.

The rule that constructive or symbolical delivery is sufficient to sustain a gift causa mortis is well recognized in this country.

8. GIFTS—EVIDENCE HELD TO SHOW GIFT WAS IN CONTEMPLATION OF DEATH.

Evidence that the claimed gift causa mortis was made, when the alleged donor was afflicted with a cancer, from which she died within three days, and that several days prior to her death the donor had sent for friends in the belief that she was going to die, *held* to show the gift was made in contemplation of death, or at least to sustain the finding of the trial court to that effect.

9. GIFTS—WRITTEN DECLARATION OF GIFT AND ORDER TO BANK TO DELIVER BOND HELD SUFFICIENT DELIVERY.

Where a woman in contemplation of death signed and delivered to the donee a written declaration that she desired the donee to have her Liberty bonds in payment for services rendered by him, and likewise gave him an order on the bank which held the bonds to deliver them to the donee, which order was written on the back of a receipt given by the bank for the purchase price of the bonds, there was a delivery sufficient to sustain the gift, since it was as effective a delivery as the donor was physically capable of making.

10. TRIAL—CONCLUSION NOT OBJECTED TO MAY BE CONSIDERED.

Where a witness was permitted to state her construction of the donor's language without objection on that ground, the trial court was justified in considering such evidence, particularly when it was against the witness's interest, because the bond which she testified was given to defendant had been previously bequeathed to witness.

11. GIFTS — DEATH BEFORE ACTUAL POSSESSION UNDER SYMBOLICAL DELIVERY DOES NOT DEFEAT GIFT.

Where bonds were given by a dying woman by the execution of a written statement to that effect and of an order on the bank in which the bonds were held for their delivery to

the donee, the gift was perfected at the time of such delivery, subject only to the condition that the donor did not recover, and is not defeated by the fact that the donee did not take actual possession of the bonds under the order until after the donor's death.

12. WITNESSES—LEGATEE HELD NOT PARTY TO SUBSEQUENT GIFT OF PROPERTY TO ANOTHER.

One to whom bonds had been bequeathed by their owner is not a party to a subsequent transaction whereby the bonds were given to another so as to render her incompetent to testify that the donor had stated she had given the bonds to the other, especially since such testimony was apparently against the interest of the witness.

13. GIFTS — WRITTEN STATEMENT OF GIFT HELD NOT TO SHOW INTENDED SALE.

An instrument executed by the owner of bonds stating that it was her desire that a person named therein should have the bonds in payment for the services rendered by him, accompanied by an order for delivery of the bonds to him, is not ineffective as a gift causa mortis because it shows a sale, and not a gift, was intended.

APPEAL from the Fifth Judicial District Court, Nye County; *Mark R. Averill,* Judge.

Action by W. E. Goldsworthy against D. S. Johnson. Judgment for defendant, and plaintiff appeals. **Affirmed.**

*Cooke, French & Stoddard,* for Appellant:

The court erred in permitting respondent to testify as to the donor's physical condition, and as to what she had told him about it three days before her death. "No person shall be allowed to testify: 1. When the other party to the transaction is dead." Rev. Laws, 5419. The alleged gift causa mortis was clearly a "transaction." The statute plainly prohibited respondent from testifying. Reinhart v. Echave, 185 Pac. 1070; Forsyth v. Heward, 170 Pac. 21; Gage v. Phillips, 21 Nev. 146; Torp v. Clemons, 142 Pac. 1115; Roney v. Buckland, 4 Nev. 44.

Testimony of a donee claiming under an alleged gift causa mortis as to what donor said not admissible. Hecht v. Schaffer, 85 Pac. 1056. "Gifts causa mortis cannot be proved by mere hearsay—declarations of the

alleged donee." 20 Cyc. 1245, 1248; 40 Cyc. 2299, 2314, 2317, 2321, 2322, 2323.

"It is essential to the validity of a gift causa mortis that it be under apprehension of death from some existing disease or other impending peril." 20 Cyc. 1235; In Re Gordon's Estate, 40 Nev. 300; Taylor v. Harmorsin, 53 N. E. 584; N. W. Co. v. Collamore, 62 Atl. 652; Zeller v. Gordan, 38 Pac. 640.

The earnings of the deceased were community property just as were the earnings of her husband, and as such appellant had the "absolute power of disposal thereof, * * * as of his own separate property." Crow v. Van Sickle, 6 Nev. 146; 21 Cyc. 1659. The wife's interest in community property is in the nature of a mere expectancy, and in any event possesses none of the attributes of an estate, either in law or equity. In Re Williams Estate, 161 Pac. 741; Packard v. Aravanus, 17 Cal. 525; Sadler v. Niesz, 31 Pac. 630; 21 Cyc. 1659. The wife has no right of disposal of community property (21 Cyc. 1668; Tyron v. Sutton, 13 Cal. 490; Coleman v. Vollmer, 31 S. W. 413), the surviving husband taking all of said property (Rev. Laws, 2164; In Re Clarke, 17 Nev. 124; 21 Cyc. 1703).

Because of the unlimited trust and confidence between husband and wife, the mere deposit in a bank by the wife, in her own name, of community moneys, consisting wholly or mainly of her earnings, with the knowledge of the husband, affords no ground for presuming a gift to the wife. McDermott's Appeal, 51 Am. Rep. 526; Bachman v. Killinger, 55 Pac. 418; 1 Bishop, Married Women, sec. 742; Cox v. Jones, 45 N. Y. 557.

The presumption is against gifts, strong evidence being required to establish them. There must be a preponderance of clear, explicit and convincing evidence in support of every element needed to constitute a valid gift. 20 Cyc. 1223, 1246. Gifts causa mortis are against the policy of the law, and are to be regarded with great

scrutiny because of the opportunities for fraud. Albro v. Albro, 65 S. W. 592; Chambers v. McCreery, 106 Fed. 364; Monahan v. Monahan, 70 L. R. A. 936.

The death of the donor revoked any authority for the delivery of the bonds. 2 C. J. 546, secs. 179, 181; Duckworth v. Orr, 36 S. E. 150; Trubey v. Pease, 16 Ann. Cas. 370. The banking corporation was not a trustee for respondent; no trust was contemplated by deceased; an imperfect gift cannot be converted into a trust. Trubey v. Pease, supra.

A gift causa mortis is made by a person who is at the time under expectation of imminent death, but the donor may revoke it before he dies. The gift takes place absolutely, if unrevoked, only upon the death of the donor. 20 Cyc. 1228; Noble v. Garden, 79 Pac. 834.

There was no delivery, the order for the bonds being a mere direction for their delivery. Pullen v. Bank, 71 Pac. 83; Woods v. Sturges, 77 South. 186. "Delivery is an indispensable requisite, without which the gift fails, regardless of consequences." Liebes v. Battman, 54 Pac. 179; Allen v. Allen, 74 Am. St. Rep. 442. In order to effect a gift inter vivos or causa mortis "there must be a parting by the donor with all present and future legal power and dominion over the property." Edwards v. Bank, 190 Pac. 59; Meyer v. Meyer, 64 South. 420; 12 R. C. L. 959.

Deceased did not intend to make a gift, but to make payment for services. Knight v. Tripp, 54 Pac. 267. There was a contemplated sale, rather than a gift. Hart v. Ketchum, 53 Pac. 931; Daniel v. Smith, 17 Pac. 683. A transaction indicating an intent to sell cannot establish an intent to give. 20 Cyc. 1231; Beaver v. Beaver, 15 Am. St. Rep. 531. "The writing must disclose a clear intention to pass a present title, and not a mere promise to give at some future time." 12 R. C. L. 958, 959. Where constructive delivery is relied on, there must be unequivocal evidence of donor's intent. Waite v. Grubb, 73 Pac. 206.

The delivery of written instruments does not constitute symbolical delivery. Comaita v. Kyle, 19 Nev. 38.

*Hugh Henry Brown* and *Walter Rowson*, for Respondent:

Gifts causa mortis are closely scrutinized by the courts, but the law does not disapprove of such gifts; they are scrutinized to prevent fraud. 12 R. C. L. 956. "If they are satisfactorily proved, it is the duty of the court to give effect to them." Sharpe v. Sharpe, 90 S. E. 34. "Where there is no doubt about the facts, it would be a legal wrong and gross injustice to refuse to act upon them fairly and without hesitation." Ellis v. Secor, 19 Am. Rep. 178.

"The wife may, without the consent of her husband, convey, charge, incumber, or otherwise in any manner dispose of her separate property." Rev. Laws, 2163. The bonds were the separate property of the wife. If the funds were separate property, the bonds were such. 21 Cyc. 1642. The wife's earnings may become her separate property by the husband's waiver of his rights thereto, "and this waiver of his marital rights may be presumed from his conduct." 21 Cyc. 1396.

"The earnings and accumulations of the wife, * * * while she is living separate and apart from her husband, are the separate property of the wife." Rev. Laws, 2168.

The several legal elements necessary to constitute a valid gift causa mortis are sufficiently proven. 12 R. C. L. 963; Williams v. Guile, 6 L. R. A. 367.

Delivery of the bonds was proven. It was a symbolical delivery; it could not be otherwise. Such a delivery is good. "When a writing evidences a clear intention to give, slight circumstances as to delivery have been held sufficient." 12 R. C. L. 957–960; Ellis v. Secor, supra; Devol v. Dye, 24 N. E. 246; Hogan v. Sullivan, 114 Iowa, 456; Sessions v. Moseley, 4 Cush. 87; Emery v. Clough, 63 N. H. 552; Walker v. Foster, 30 Can. S. C. 299.

The power of the bank to deliver the bonds was not revoked by the death of the donor. There was no conditional delivery; the order to deliver was absolute. A gift causa mortis is operative to transfer the title and vest it in the donee at once. Death does not revoke the power to deliver, where the instruction is unconditioned. Caylor v. Caylor, 52 N. E. 465; Ruggles v. Lawson, 13 Johns. 285; Hathaway v. Payne, 34 N. Y. 92; Michener v. Dale, 23 Pa. 59.

Intent of the donor to make a gift causa mortis is proven. Ellis v. Secor, supra.

·By the Court, COLEMAN, J.:

The appellant having been the plaintiff below, the parties will be referred to in this opinion as plaintiff and defendant.

The plaintiff is the surviving husband of Margaret L. Goldsworthy, who died on May 9, 1918. They were married on December 25, 1910. Upon their marriage they took up their residence at the Mercury mine at Ione, in Nye County, where the plaintiff held a position as superintendent of that property. They continued to reside together at the place mentioned until 1913 (prior to which time the mine closed down and the plaintiff lost his position), when it was decided that the wife should seek employment elsewhere. She went to Tonopah, where she soon secured employment, leaving the plaintiff at their home at the mine. She remained at Tonopah for some months, during which time she earned about $900. She opened an individual account with two San Francisco banks, and placed all of her earnings during the period mentioned in those accounts. Later she put some of them in a postal-savings account at Tonopah, the balance being in savings account in San Francisco. In 1917 she used the money so earned in the purchase of Liberty bonds, which were held for her by the Tonopah Banking Corporation. Prior to the purchase of the bonds the Mercury mine resumed opera-

tions, and the plaintiff procured his old position. Mrs. Goldsworthy thereupon returned home. In the fall of 1917 she was taken seriously ill, and it was deemed advisable that she be removed to a hospital in Reno. While it seems that she never fully recovered, she returned home, where she died.

On May 6, 1918, three days prior to her death, she wrote, signed, and delivered to the defendant two instruments, as follows:

"It is my wish that D. S. Johnson have the Liberty bonds to have and to be used as he may deem best in payment of services rendered me.

"Margaret L. Goldsworthy."

"Tonopah Banking Corp.: Please deliver to D. S. Johnson $1,000 bonds called for by this receipt.

"Margaret L. Goldsworthy."

The latter instrument was written upon the back of a receipt executed by the Tonopah Banking Corporation for money paid by the deceased on account of the bonds.

This is an action to recover the bonds; plaintiff claiming the same as community property. The defense to the action is that the conduct of the deceased amounted to a donatio causa mortis. The lower court ordered judgment in favor of the defendant; hence this appeal.

The first contention we are called upon to determine is whether the Liberty bonds were the separate property of Mrs. Goldsworthy at the time she executed the instruments quoted. The determination of this question involves the correct application of section 2169 of the Revised Laws of 1912 to the facts, since, generally speaking, all property acquired through the earnings of either spouse is community property. The section mentioned reads:

"When the husband has allowed the wife to appropriate to her own use her earnings, the same, with the issues and profits thereof, is deemed a gift from him to her, and is, with such issues and profits, her separate property."

1. The question is: Did the plaintiff "allow" the deceased "to appropriate to her own use" her earnings? If he did, we must construe the same as being her separate property. In this connection it is strenuously insisted that the trial judge based his conclusion upon an erroneous theory, and that therefore we must reverse the judgment. Assuming it to be true that the lower court was in error in the reasons given in its opinion for the judgment rendered, we would not be justified in reversing the judgment if a proper application of the law to the facts demands its affirmance. If the judgment is right upon any theory, even though it be upon one never thought of by the trial court, and is sustained by the findings and evidence, it is our duty to affirm it, for in so doing we do not have to lend approval to the mental processes of the trial court. We must determine whether the deceased appropriated her earnings to her own use, and, if so, whether it was by allowance of her husband.

This is a case of first impression in this court, and no authority has been called to our attention in which a similar state of facts, applicable to a statute like ours, has been considered; hence we must pioneer in reaching a conclusion. .

2. Much is said as to the proper meaning to be given to the word "allow" and the phrase "to appropriate to her own use" of the statute in question. The arrival at a proper conception of the intention of the legislature in adopting this section of our statute should be our sole aim. In view of the fact that under our statute, generally speaking, all property acquired by the husband and wife during coverture is community property, we must determine whether the facts and circumstances of this case bring it within the exception contemplated by the statute quoted. We think the words "allow" and "appropriate" should be given their ordinary meaning, the meaning which the layman would attach to them in everyday use. They need no interpretation; there is no room for construction. The only question is: What

was the real attitude of the parties toward the earnings of Mrs. Goldsworthy? This is the test to be applied in reaching a conclusion in this case, and there is no occasion for a finespun interpretation of simple words. Lawyers and courts too often complicate that which is plain. There is no sense in attributing to a legislature in enacting general statutes affecting the domestic and financial affairs of husband and wife any hidden or mysterious intention in the use of common words. With these ideas in mind and with the further thought to guide us that the utterances, or lack of utterances, and the conduct of the parties coeval with the period during which the money was being earned, and their subsequent conduct, are the surest guides in ascertaining their intentions, let us inquire whether the earnings of the deceased were appropriated to her own use, and, if they were, whether such appropriation was pursuant to the allowance of the plaintiff.

The deceased left Ione with the avowed purpose of earning money. That she did earn several hundred dollars within a few months thereafter, with the knowledge and consent of her husband, is not denied; that she never turned over to her husband one dollar of the money so earned is not questioned; that her husband repaid to her $50 which she had paid to a merchant to apply upon the indebtedness of about $75 contracted by the plaintiff during her absence is admitted; that she kept the money so earned, except as paid out for her individual use, during her absence in an interest-bearing account in savings banks to her personal credit, though there was a joint community account, is without doubt; that she invested the same early in 1917 in Liberty bonds is admitted; and that the plaintiff made no inquiries as to what she was doing with her earnings or in the least, by word or action, manifested the slightest interest in the same, is conceded. In the light of this situation, did the deceased appropriate her earnings to her own use, and did the plaintiff allow her to do so?

3.   The act of which the section in question is a part
is entitled "An act defining rights of husband and wife"
(Rev. Laws, 2160), section 6 of which provides that
the husband has the entire management and control
of the community property.  By this section an active
duty is imposed upon the husband as to the community
property.  He is not only presumed to know the law, but,
if we may draw an inference from the testimony of the
plaintiff, we would be justified in saying that as a matter
of fact the plaintiff actually knew his rights as to the
earnings of his wife.  Notwithstanding this, he never
manifested the least interest as to what disposition
she was making of her earnings.  Naturally he has his
explanation.  He testified that he considered that he and
his wife were partners, and hence that he still retained
his interest.  By not turning over her earnings to the
management and control of her husband, and by divert-
ing them to other channels, keeping them under her own
dominion and control, in her private interest-bearing
savings-bank accounts, and by using them from time to
time in whatever manner she saw fit for her own use
and benefit, was in our opinion an appropriation.

4.   The statute imposing an active duty upon the
husband to control and manage the earnings in question,
failure to assume that obligation, permitting his wife to
exercise her own pleasure in the matter, without objec-
tion or question, was certainly an allowance of her doing
so, so far as he was concerned.  To allow her to appro-
priate her earnings required no express assent;  his
conduct in acquiescing was enough.  Where an active
duty is imposed, failure to assert one's rights over a
period of more than three years, in the face of the situa-
tion here presented, certainly justified the conclusion
that he assented.

This conclusion is not only based upon sound reason-
ing, but by analogy the rule of emancipation of a child by
its parent amply sustains our position.  The earnings of

the wife are a part of the community property, of which the husband has the sole management and control. The father is entitled to receive the earnings of a minor child, to use them as he may choose, but this right, which is as definite, certain, and positive as is a husband's right to receive, manage and control his wife's earnings, may be forfeited by emancipating the child, which may be manifested by a failure to assert his right to receive its earnings and by acquiescing for a sufficient length of time in a course of conduct on the part of the child which shows his intention to emancipate it. What may constitute an emancipation depends upon the peculiar facts and circumstances of each particular case. No case can be a definite guide to a court in another case. And such is the fact in ascertaining whether a husband "allows" his wife to appropriate her earnings to her own use. In Flynn v. Baisley, 35 Or. 268, 57 Pac. 908, 45 L. R. A. 64, 76 Am. St. Rep. 495, which was a suit to subject certain property conveyed by Baisley to his two sons to the payment of a debt of the father, it was claimed that the property was conveyed to the sons in consideration of certain moneys earned by them during their minority, which earnings in fact belonged to the father, and hence there was no consideration for the transfer. The court in deciding the point said that whether the money paid by the sons to the father belonged to the father depended upon whether he had in good faith emancipated the sons. There is not in the case cited a detailed statement of the facts and circumstances tending to show emancipation, but it does appear that the father permitted his sons to earn money and to retain control of the same, one of the boys having acquired a bank account of $500. The court held that the circumstances of the case showed an emancipation.

In Cloud v. Hamilton, 11 Humph. (Tenn.) 104, 53 Am. Dec. 778, it was held that, while the father was entitled to the custody of his son and to receive his earnings, such rights might be waived, as might appear by express

agreement or be implied from facts and circumstances. The court in Burdsall v. Wagoner, 4 Colo. 261, after reciting the facts, sums up as follows:

"While it is clear that as a rule the father is entitled to the earnings of his son during minority, yet it is equally clear that this right may be relinquished, and where such minor son contracts on his own account for his services, and the father knows of it and makes no objection, there is an implied assent that the son shall be entitled to his earnings. Morse v. Welton, 6 Conn. 551; Whiting v. Earle, 3 Pick. 201; Nightengale v. Worthington, 15 Mass. 273."

The rule is stated as follows in 20 R. C. L. p. 609:

"An implied emancipation results when the parent, without any express agreement, impliedly consents by his acts and conduct that the child may have his own time and the control of his earnings, or such consent is inferred from or shown by circumstances."

Without reviewing or quoting from other authorities, we cite the following as sustaining the general rule: Note to Culberson v. Alabama Const. Co., 9 Ann. Cas. 507; Rounds Bros. v. McDaniel, 133 Ky. 669, 118 S. W. 956, 134 Am. St. Rep. 482, 19 Ann. Cas. 326, and note 330.

The next question is: Was there a valid gift causa mortis? In this connection we will dispose of the assertion that the death of the deceased before the delivery of the bonds revoked the authority of the bank to make delivery. We do not intend to follow counsel for appellant in their line of argument because they do not go directly to the question involved, but take a circuitous route, across which many obstacles to a clear comprehension of the real question are thrown.

5. The respondent relying upon a gift causa mortis, we need only to determine if under the law and the evidence the finding of the trial court to the effect that there was such a gift is justified. The essentials of a gift causa mortis are few and simple. As a rule, such

a gift is made under circumstances and conditions which preclude a more formal transaction. The essentials are that it be made in anticipation of the near approach of death, by an actual or symbolical delivery, by the donor, or at his express request, of personal property, to the donee, or to some one in his behalf, subject to the right in the donor, implied by the law, to revoke the gift in case of his recovery.

Gifts causa mortis seem to be of very ancient origin. They are clearly sanctioned by the Roman civil law having been borrowed, as some commentators say, from the Greeks, in proof of which it is said that an instance of a perfect gift causa mortis is related in the Odyssey (book 17, v. 78), where Telemachus makes presents to Piræus if he be slain, and another by Hercules in the Alcestes of Euripides (v. 1020). While these may have been typical of gifts causa mortis, whether they were inspired and sustained by the jurisprudence of their time does not seem clear. That such gifts, however, found justification in the Roman law, as stated, is shown by no less an authority than Justinian, as is seen by the following quotation from a translation by Walker:

"A gift causa mortis is one made in expectation of death; when a person gives upon condition that, if any fatality happen to him, the receiver shall keep the article, but that if the donor should survive, or if he should change his mind, or if the donee should die first, then the donor shall have it back again. These gifts causa mortis are in all respects put upon the same footing as legacies. For since there was a difference of opinion amongst lawyers whether such a donation ought to be equivalent to a gift or to a legacy, possessing as it did some of the characteristics of each, so that some of them classed it with one and some with the other, a constitution was issued by us ordaining that it should be classified with legacies in almost all respects, and should be solemnized in the manner which our constitution laid down. To put it briefly, a gift causa mortis is

when a person wishes that he himself should have the gift in preference to the donee, but that the donee should have it in preference to the heir." Walker's Just. p. 119.

See, also, Cooper's Just. (3d ed.) p. 100; Sandars Just. (13th ed.) p. 147, note.

6. It matters not much to us what the rule was under the Grecian and Roman jurisprudence, and we call attention to the fact that such gifts seem to have been sanctioned by those systems to show the lack of foundation for the frequent assertion that they are not favored. Because of the ease with which fraud may be perpetrated, they are closely scrutinized and must be established by clear, convincing, and satisfactory proof, but when so established the courts regard them with as much favor as they do a bequest or devise under a will. Blackstone, in book II, c. 32, of his great work, in discussing the rights of things, after a consideration of what he terms formal legacies, says:

"Besides these formal legacies, contained in a man's will and testament, there is also permitted another deathbed disposition of property which is called a donation causa mortis. And that is when a person in his last sickness, apprehending his dissolution near, delivers or causes to be delivered to another the possession of any personal goods (under which have been included bonds and bills drawn by the deceased upon his banker) to keep in case of his decease. This gift, if the donor dies, needs not the assent of his executor; yet it shall not prevail against creditors, and is accompanied with this implied truth, that, if the donor lives, the property thereof shall revert to himself, being only given in contemplation of death, or causa mortis. This method of donation might have subsisted in a state of nature, being always accompanied with delivery of actual possession. * * *"

The first case which came before the courts of England in which an alleged donation causa mortis was involved

was that of Jones v. Selby (Finch's Prec. in chapter 300), decided in 1710, wherein the contents of a trunk were involved. The facts of that case show that there was no delivery of the trunk, but merely of the key to it. Lord Hardwicke, in Ward v. Turner, 2 Ves. Sr. 431, interpreted the decision in Jones v. Selby as sustaining a symbolic delivery, but a careful reading of the opinion seems to indicate that the judgment was reversed for other grounds, and that the question of symbolic delivery was not considered. But we confess that Lord Hardwicke was better situated to arrive at a correct interpretation of the opinion than we are. That learned jurist, however, in Ward v. Turner, supra, expresses his disapproval of a symbolic delivery, yet he seems to have recognized the force of such a delivery, for he says:

"The only case wherein such a symbol seems to be held good is Jones v. Selby; but I am of opinion that amounted to the same thing as delivery of possession of the tally, provided it was in the trunk at the time."

In speaking of Lord Hardwicke's attitude on symbolic delivery, Kent says:

"Symbolical delivery is very much disclaimed by Lord Hardwicke in this case, and yet he admits it to be good when it is tantamount to actual delivery; and in Smith v. Smith it was ruled that the delivery of the key of a room containing furniture was such a delivery of possession of the furniture as to render the gift causa mortis valid. C. J. Gibbs said that was a confused case; but the efficacy of delivery, by means of the key, was not a questionable fact." Kent's Comm. (14th ed.) p. 730.

While it may be that there is some confusion among the early English authorities as to whether or not there could be a symbolic delivery, the great weight of authority in this country clearly sustains such a delivery; the main point of divergence apparently being whether or not the facts of a particular case justify a holding that there was a symbolic delivery. For instance, it was held in Ridden v. Thrall, 125 N. Y. 572, 26 N. E. 627, 11

L. R. A. 684, 21 Am. St. Rep. 758, that a donation causa mortis might be made of deposits in bank by mere delivery to the donee of the bank-book showing the deposits, the court saying:

"The gift was consummated by the delivery of the books, and no other formality was needed to constitute the actual delivery of the bank deposit needful to vest the possession and title in the donee. In savings banks in this state such deposit books are issued as evidence of the indebtedness of the banks. Withdrawals of deposits are entered in the same books, so that the deposit book always, with the addition of any interest, shows the actual state of the accounts between the depositor and the bank and the whole indebtedness of the bank. It answers the same purpose in the case of a savings bank that is answered by a certificate of deposit in the case of other banks. The decisions are not entirely harmonious as to the sufficiency of the mere delivery of such deposit books to constitute a valid gift, either inter vivos or causa mortis. But the general rule in England and in this country, and particularly in this state, is that any delivery of property which transfers to the donee either the legal or equitable title is sufficient to effectuate a gift; and hence it has been held that the mere delivery of nonnegotiable notes, bonds, mortgages, or certificates of stock is sufficient to effectuate a gift."

On the other hand, in Thomas's Admr. v. Lewis, 89 Va. 1, 15 S. E. 389, 18 L. R. A. 170, while the court held that the delivery of the possession of a savings-bank pass-book did not consummate a donation causa mortis, it did expressly recognize that there might be a symbolic delivery, in saying:

"Delivery is essential; it may be either actual, by manual tradition of the subject of the gift, or constructive, by delivery of the means of obtaining possession. Constructive delivery is always sufficient when actual, manual delivery is either impracticable or inconvenient."

In Stephenson's Admr. v. King, 81 Ky. 425, 50 Am. Rep. 173, it was held that the delivery to the donee of a key to a desk in which was a letter from the donor's agent containing a statement that he held a note and bond belonging to the donor, accompanied by words of gift, constituted a good symbolic delivery of the note and bond.

The decision which seems to go further than any other which has come to our attention to sustain an alleged constructive delivery is that of McKenzie v. Steeves, 98 Wash. 17, 167 Pac. 50. This was a case of a gift of an automobile. It seems that there was neither an actual delivery of the automobile nor a writing, order, or other document directing its delivery to the donee. In fact, the gift seems to have been based entirely upon the statement of the donor, who was then on the verge of dissolution in a hospital, in the following words: "I give you my automobile, May." The opinion says that the donee "took and had charge of the automobile for several days," but it nowhere appears from the opinion when or under what circumstances she took charge of it.

7. In calling attention to these cases, we do not desire to be understood as approving or disapproving any of them, but merely as pointing out that the rule of constructive or symbolical delivery is well recognized in this country, which fact is clearly shown by reference to all the text-writers, digests, annotators, and other authorities. See Am. & Eng. Ency. Law (2d ed.) 1059; 20 Cyc. 1233; 12 R. C. L. 961.

8. Thus we are brought to inquire whether the facts of this case justified the finding that there was a constructive or symbolical delivery of the bonds. Before proceeding further, we think we may say there can be no serious question but that the evidence shows that the donor executed the instruments in question in the immediate anticipation of the near approach of death. She was afflicted at the time with a cancer, and died within three days. The testimony of Mrs. Keough

shows that she and another lady were sent for by the deceased several days prior to her death, in the belief that she was going to die. Even if it were a doubtful question, we would not be justified in overthrowing the finding of the trial court to the effect that the transaction took place in anticipation of death.

9. At the time the instruments were executed the bonds were in the possession of the Tonopah Banking Corporation, at Tonopah, Nevada, a day's journey from the place where the donor was confined to her bed. It was physically impossible for her to deliver the bonds. She did the next best thing; she gave an order to the bank, written on the back of the receipt which it had given her for the money paid for the bonds, for their delivery to the donee, and simultaneously executed and delivered to the donee the writing wherein she said: "It is my wish that D. S. Johnson have the Liberty bonds. * * *" Supplementing these writings, the donor said to Mrs. Keough that she had given the bonds to defendant.

10. As to this last statement, counsel for defendant contend that such is Mrs. Keough's construction of the donor's language. This is true, but the testimony was not objected to at the trial; hence we think the trial court was justified in considering it, particularly in view of the fact that the deceased had theretofore bequeathed the bonds to the witness; and in the conversation related by Mrs. Keough the donor informed Mrs. Keough that she had changed her mind and given the bonds to defendant, requesting Mrs. Keough to make no trouble over them. It is not pointed out what more the donor could have done to effectuate a perfect donation causa mortis, and we are at a loss to conceive what further means could have been resorted to to consummate that purpose. To our minds, the court was amply justified in its finding that there was a gift causa mortis.

11. It is said that the fact that the instruments in writing set out herein were not presented to the bank

prior to the death of Mrs. Goldsworthy defeated the attempted gift. We think not. The gift was complete when the instruments were delivered, subject to revocation in case of recovery. All of the authorities contemplate that in case of a symbolical delivery the gift is complete, subject to the condition mentioned, at the moment of the gift and symbolical delivery. To hold otherwise would in effect nullify the holding that a symbolical delivery is equivalent to actual delivery, and put it in the power of designing and unscrupulous persons to defeat the intention of the donor.

12. Before proceeding further, we wish to dispose of the contention that the trial court erred in receiving the testimony of Mrs. Keough. The objection is based upon the claim that she was a party to the transaction between Mrs. Goldsworthy and the defendant, and that our statute precludes the giving of evidence by a surviving party to a transaction when the other party is dead. Clearly the statute in question has no application to the situation before us. The object of the statute is to prevent one interested party from giving testimony when the other party's mouth is sealed by death. In the first place, Mrs. Keough is not a party to the transaction between Mrs. Goldsworthy and the defendant, and, though she is said to be a beneficiary under a will executed about the time of the transaction in question, so far as appears it would be to her benefit to see the defendant defeated in this action. From whatever angle we view the situation, we must hold that there is no justification for the objection, whether from that of being a party to the transaction or that of one who would be benefited by testifying in behalf of defendant.

13. We come now to the contention that Mrs. Goldsworthy had no intention of making a gift. It is said that she intended only to make a bill of sale of the bonds in question. This attitude is based upon the language in the writing quoted—that defendant should have the bonds "in payment of services rendered me." We do

not think we would be justified, in the circumstances, in sustaining this contention. We take it that, while no consideration is necessary to sustain a gift causa mortis, we cannot close our eyes to the fact that it is probable that every gift causa mortis is based upon some consideration. Perhaps it would be more accurate to say that such a gift is prompted because of some sentimental reason moving the donor. This sentiment may be founded upon the love and affection of a husband for a wife, a father for his child, a lover for one whom he had hoped to make his bride, an appreciative person for acts of kindness, or in token of the high esteen entertained by the donor for the donee—all honorable and worthy sentiments. Indeed it would be a strange thing for one in anticipation of the near approach of death to make a gift without being moved to do so because of some one of the reasons which we have enumerated. In the particular instance, in view of all the circumstances, we think the trial court was justified in taking the view that the words "in payment of services rendered me" did not import a sale, any more than would the words "in token of my deep appreciation of the many kindnesses shown me," or if the words "as evidence of the esteem in which he is held because of the services rendered me." True it is that the consideration of a sale may be an existing indebtedness, but there is nothing in this case to indicate that there was an existing indebtedness, or that the donor or the donee considered that any indebtedness existed, unless it be the words which we have quoted; but we must construe those words in connection with the other words of the writing, and in the light of the other testimony. The other words of the writing do not indicate a sale, but rather a gift. We can imagine that it might be said that they were the words of a woman inexperienced in such matters, who knew nothing of the use of technical words of transfer of personal property. So might we say of the use of the words "in payment of

services rendered." In view of the entire testimony, we would not be justified in overthrowing the findings of the trial court to the effect that the transaction amounted to a gift to defendant, and not a sale.

For the reasons given, the judgment is affirmed.