[S.F. No. 22826. In Bank. Aug. 27, 1971.]

COLETTE JOLICOEUR, a Minor, et al., Petitioners, v.
EMMERY MIHALY, as Registrar of Voters, etc., et al., Respondents.

[S.F. No. 22827. In Bank. Aug. 27, 1971.]

JAMES TABILIO, a Minor, et al., Petitioners, v.
EMMERY MIHALY, as Registrar of Voters, etc., et al., Respondents.

[L.A. No. 29906. In Bank. Aug. 27, 1971.]

MARK STEVEN RANDELL, a Minor, etc., et al., Petitioners, v.
JAMES S. ALLISON, as Registrar of Voters, etc., Respondent.

## COUNSEL

John R. Cosgrove, Jorgenson, Cosgrove, Andrews, Elliott & Gillio, Joseph Freitas, Jr., Dov M. Grunschlag, Robert Powsner, William A. Dobrovir, David L. Crump, Roger Jon Diamond and William Bennett for Petitioners.

Thomas M. O'Connor, City Attorney, Milton H. Mares, Deputy City Attorney, Richard J. Moore, County Counsel, Thomas J. Fennone, Deputy County Counsel, George P. Kading, County Counsel, Don H. Vickers, Deputy County Counsel, Robert G. Berrey, County Counsel, Joseph Kase, Jr., Assistant County Counsel, John D. Maharg, County Counsel, Edward H. Gaylord, Assistant County Counsel, Edmund G. Brown, Jr., and Daniel H. Lowenstein for Respondents.

## OPINION

**PETERS, J.** — In these proceedings we are called upon to determine whether the newly enfranchised young people of this state residing apart from their parents shall be treated like other voters for purposes of acquiring a voting residence or, on the contrary, shall be presumed to reside with their parents. We conclude that for state officials to treat minor citizens differently from adults for any purpose related to voting would violate the Twenty-sixth Amendment to the United States Constitution. We also conclude that strong state policies require that voters participate in elections where they reside and, in accordance with California law permitting a minor to be emancipated for residential or other purposes, that California law requires that minors of 18 years of age or older be treated as emancipated and hence as adults for voting purposes in light of the Twenty-sixth Amendment.

Petitioners are nine individual unmarried minors and two organizations. The nine individuals sought to register to vote in the jurisdiction they claim to be their actual permanent residence. Registrars of voters in the City and County of San Francisco, Alameda County, Santa Barbara County, San Diego County, and Los Angeles County refused to register the individual petitioners because they did not register at their parents' address, pursuant to the California Attorney General's opinion of February 17, 1971 (Opn. No. 70/213, 54 Adv.Ops.Cal.Atty.Gen. 7, 12), in which he concluded that "for voting purposes the residence of an unmarried minor [whether student or not] . . . will normally be his parents' home" regardless of where the minor's present or intended future habitation might be.

In reliance upon this opinion, respondent Mihaly told petitioner McConville, whose parents live in Argentina, that he could not vote in local elections at all unless he became a *married* minor. Petitioners Pang and Fruchtendler were told that they would have to register to vote in Hawaii and Arizona, respectively. The six other individual petitioners were told to register in other California jurisdictions up to 700 miles away from their claimed permanent residences. Petitioners Jolicoeur and King, who are fully self-supporting and work full-time, were told that these facts were irrelevant to their capacity to establish a legal residence for voting purposes. Petitioner Randell, who has *never* lived at his parents' current domicile, and is not familiar with any political issues pertinent to that area, was told that he must vote there and not where he lives.

Petitioners invoke the original jurisdiction of this court,[1] seeking writs of mandate directed to the respondent registrars ordering respondents to register petitioners according to the same procedures and qualifications that are followed with respect to adult registrants, pursuant to Elections Code, sections 14280-14292.[2]

*The Twenty-sixth Amendment:* On June 22, 1970, President Nixon signed into law the Voting Rights Act of 1970 (P.L. 91-285, 84 Stats. 314), title III of which purported to lower the voting age to 18 for all federal, state, and local elections. After the United States Supreme Court held unconstitutional that part of title III which applied to nonfederal elections (*Oregon* v. *Mitchell* (1970) 400 U.S. 112, 118 [27 L.Ed.2d 272, 278, 91 S.Ct. 260]), Congress passed Senate Joint Resolution 7 on March 23, 1971, submitting a proposed constitutional amendment to the states for ratification, pursuant to article 5 of the federal Constitution. On June 30, 1971, Ohio became the 38th state to ratify the Twenty-sixth Amendment to the United States Constitution, and it became law.

---

[1]Petitioners could have sued to enforce their rights pursuant to Elections Code, section 350. Instead petitioners ask us to exercise our original jurisdiction (Cal. Const., art. VI, § 10; Cal. Rules of Court, rule 56 (a)). We exercise such jurisdiction only in cases in which "the issues presented are of great public importance and must be resolved promptly." (*County of Sacramento* v. *Hickman* (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].) Cases affecting the right to vote and the method of conducting elections are obviously of great public importance. Moreover, the necessity of adjudicating the controversy before the election renders it moot usually warrants our bypassing normal procedures of trial and appeal. Thus we have exercised our original jurisdiction where electors sought to qualify an initiative for the ballot (*Perry* v. *Jordan* (1949) 34 Cal.2d 87, 90-91 [207 P.2d 47]; *Farley* v. *Healey* (1967) 67 Cal.2d 325, 326-327 [62 Cal.Rptr. 26, 431 P.2d 650]), where a proposed local election would have violated the city charter (*Miller* v. *Greiner* (1964) 60 Cal.2d 827, 830 [36 Cal.Rptr. 737, 389 P.2d 129]), and where an individual sought certification by the city clerk as a candidate for office. (*Camara* v. *Mellon* (1971) 4 Cal.3d 714 [94 Cal.Rptr. 601, 484 P.2d 577].)

No less speedy resolution of the issues presented by petitioners would be adequate here. The last day for registration for the November 2, 1971, election is September 9, 1971. The last day for registration for the June 6, 1972, election is April 13, 1972. It is highly unlikely that petitioners could secure a superior court decision *and* complete the inevitable appeals by either side from that decision in time to register for these elections.

[2]The remedy invoked—mandate—is appropriate. (Code Civ. Proc., §§ 1085-1086.) Voting registrars are public officers with the ministerial duty of permitting qualified voters to register. Mandamus is clearly the proper remedy for compelling an officer to conduct an election according to law. (*Miller* v. *Greiner, supra,* 60 Cal.2d 827, 830; *Partridge* v. *Devoto* (1905) 148 Cal. 167 [82 P. 775]; see also *Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716 [94 Cal.Rptr. 602, 484 P.2d 578]; cf. *Keane* v. *Mihaly* (1970) 11 Cal.App.3d 1037 [90 Cal.Rptr. 263].) Mandamus is also appropriate for challenging the constitutionality or validity of statutes or official acts. (*Metropolitan Water Dist.* v. *Marquardt* (1963) 59 Cal.2d 159, 170 [28 Cal.Rptr. 724, 729, 379 P.2d 28]; *Zeilenga* v. *Nelson, supra,* 4 Cal.3d 716; *San Francisco Unified School Dist.* v. *Johnson* (1971) 3 Cal.3d 937 [92 Cal.Rptr. 309, 479 P.2d 669].)

Section 1 of the Twenty-sixth Amendment provides: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied *or abridged* by the United States or by any State on account of age." (Italics added.)

■ The Twenty-sixth Amendment prohibits abridging the right to vote on account of age. ■ The word "abridge" means diminish, curtail, deprive, cut off, reduce. (Webster's New Internat. Dict. (3d ed. 1961) p. 6; *Schermerhorn* v. *Local 1625 of Retail Clerks Int. Assn.* (Fla. 1962) 141 So.2d 269, 276; *Piegts* v. *Amalgamated Meat Cutters, etc.* (1955) 228 La. 131, 139 [81 So.2d 835, 838]; *Gray* v. *Johnson* (S.D. Miss. 1964) 234 F.Supp. 743, 746.) *Gray* is significant for its interpretation of similar language in the Twenty-fourth Amendment, which forbids denial or abridgment of the right to vote on account of failure to pay a poll tax. The court in *Gray* held unconstitutional as abridging the right to vote a Mississippi statute which compelled persons exempted from the poll tax by the Twenty-fourth Amendment to secure special receipts within a limited period of time. The burden put on exempted voters to obtain the special receipts was held to circumscribe, impair, and impede the right to vote.

Compelling young people who live apart from their parents to travel to their parents' district to register and vote or else to register and vote as absentees burdens their right to vote no less than the State of Mississippi burdened its poor people in *Gray*. Such young people would be isolated from local political activity, with a concomitant reduction in their political influence and information. The burden placed on youth would be different than that placed on other absentee voters. The youth, unlike other absentee voters, claims his current residence as his domicile but would be disqualified solely "on account of age."

Sophisticated legal arguments regarding a minor's presumed residence cannot blind us to the real burden placed on the right to vote and associated rights of political expression by requiring minor voters residing apart from their parents to vote in their parents' district. ■ The Twenty-sixth Amendment, like the Twenty-fourth, Nineteenth, and Fifteenth before it, "nullifies sophisticated as well as simple-minded modes of discrimination. It hits onerous procedural requirements which effectively handicap exercise of the franchise . . . although the abstract right to vote may remain unrestricted. . . ." (*Lane* v. *Wilson* (1939) 307 U.S. 268, 275 [83 L.Ed. 1281, 1287, 59 S.Ct. 872].)

■ An unmarried minor must be subject to the same requirements in proving the location of his domicile as is any other voter. ■ Fears of

the way minors may vote or of their impermanency in the community may not be used to justify special presumptions—conclusive or otherwise—that they are not bona fide residents of the community in which they live.

In *Carrington* v. *Rash* (1965) 380 U.S. 89 [13 L.Ed.2d 675, 85 S.Ct. 775], the United States Supreme Court was faced with a quite similar problem. There a Texas statute prevented persons entering the state as soldiers from acquiring a voting residence in the state while soldiers. The state claimed that military personnel might not make responsible use of the ballot, might vote in a bloc if under the dominating influence of a commanding officer, and, as transients without a stake in the future of the area, might vote against needed bond issues and property taxes. The court's answer was clear: Texas might restrict the franchise to bona fide residents, but it could not conclusively presume soldiers to be transients. To the state's claim that soldiers could "take over" a small town near the base, the court responded firmly: "'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." (*Id.*, at p. 94 [13 L.Ed.2d at p. 679].) *Carrington* obviously applies to minors as well as to soldiers.

Were there any doubt that the Twenty-sixth Amendment is intended to compel adult treatment of minors for voting purposes, reference to the legislative history of the amendment would dispel it. ▪ It is clear from that history, which is entitled to "an important place in ascertaining the legislative intent" (*Freedland* v. *Greco* (1955) 45 Cal.2d 462, 467 [289 P.2d 463]; cf. *Bourland* v. *Hildreth* (1864) 26 Cal. 161, 180; *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 624 [87 Cal.Rptr. 481, 470 P.2d 617]), that Congress believed both that minor voters are entitled to be treated as adults for voting purposes and that voting in the youth's actual place of residence is essential to accomplishing a primary congressional goal of channelling youthful idealism through the political process.

The legislative history of title III of the Voting Rights Act of 1970 and the Twenty-sixth Amendment reveals a rare consensus of concerns and objectives among Senators and Representatives who engaged in debate. Congressmen stressed three consistent themes: first, that today's youth is better informed and more mature than any other generation in the nation's history.[3] Second, Congress was influenced by the fact that over half the

---

[3]See, e.g., Hearings before the Subcommittee on Constitutional Amendments of the Committee on the Judiciary, 91st Cong., 2d Sess., at p. 130 (President Nixon); 116 Cong. Rec. S3216 (daily ed. March 9, 1970), remarks of Sen. Goldwater; 116 Cong. Rec. S3216, S3392, H5661, H5668 (daily ed. March 9, 10, and June 17, 1970), remarks of various Congressmen re educational attainment of youth.

deaths in Vietnam have been of men in the 18-20 age group.[4] Third, and perhaps of paramount immediate importance, Congressmen uniformly expressed distress at the alienation felt by some youths, and expressed hope that youth's idealism could be channelled within the political system.[5]

It would be impossible here to analyze fully the extensive hearings and debates held on whether to extend the vote to 18-year-olds.[6] One of the best and most concise guides to congressional intent is the Senate Report accompanying Senate Joint Resolution 7 (later enacted as the Twenty-sixth Amendment), a report adopted by both houses of Congress by more than a two-thirds majority. (S.Rep. 92-26, 1971 U.S. Code Cong. & Admin. News 362.) "Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes. [Citations.]" (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 249 [66 Cal.Rptr. 20, 437 P.2d 508].) That report makes the following "Case for 18-Year-Old Voting."

"First, these younger citizens are fully mature enough to vote. There is no magic to the age of 21. The 21 year age of maturity is derived only from historical accident. In the eleventh century 21 was the age at which most males were physically capable of carrying armor. But the physical ability to carry armor in the eleventh century clearly has no relation to the intellectual and emotional qualifications to vote in twentieth century America. . . . [¶] . . . Today more than half of the 18- to 21-year-olds are receiving some type of higher education. Today nearly 80 percent of these young people are high school graduates. It is interesting to compare these recent statistics with some from 1920, when less than 10 percent went on to college and less than 20 percent of our youngsters actually graduated from high school. [¶] Second, our 18-year-old citizens have earned the right to vote because they bear all or most of an adult citizen's responsibilities. . . . [¶] Third, these younger voters should be given the right to full participation in our political system because they will contribute a great deal to our society. Although some of the student unrest of recent years has led to deplorable violence and intolerance, much of this unrest reflects the interest and concern of today's youth over the important issues of our day. . . . [¶] The Committee believes that we must channel these energies into our political system and give young

---

[4]See, e.g., 116 Cong. Rec. S3058 (Sen. Kennedy), S3214 (Sen. Cook), H5651 (Rep. Stokes), H5654 (Rep. McCloskey, Jr.) (daily ed. March 5, 9 and June 17, 1970).

[5]See, e.g., 116 Cong. Rec. H5675 (Rep. Ottinger), and H5643 (Rep. Anderson) (daily ed. June 17, 1970).

[6]See generally, Note, *Legislative History of Title III of the Voting Rights Act of 1970* (1970) 8 Harv.J.Legis. 123.

people the real opportunity to influence our society in a peaceful and constructive manner. . . . [¶] 'The anachronistic voting-age limitation tends to alienate them from systematic political processes and to drive them into a search for an alternative, sometimes violent, means to express their frustrations over the gap between the nation's ideals and actions. Lowering the voting age will provide them with a direct, constructive and democratic channel for making their views felt and for giving them a responsible stake in the future of the nation.' [¶] Thus the Committee is convinced that the time has come to extend the vote to 18-year-olds in all elections: . . ." (1971 U.S. Code Cong. & Admin. News at pp. 365-367.)

The committee did not ignore the importance of local elections, which are most affected by denying minors the right to establish a domicile of choice for voting purposes: "If the energy and idealism of the young are needed in elective politics, they are needed no less at the State and local level. [¶] Moreover, *many of the problems that most concern younger citizens are largely matters of local and State policy: the quality of education at all levels; the state of the environment; planning and community development. In these areas, participation of the young in local and State elections is particularly appropriate and necessary, and their point of view especially valuable in devising responsible programs.*" (1971 U.S. Code Cong. & Admin. News at p. 372; italics added.)

Finally, the report notes the confusion and delay that would be caused by a dual-age voting system. Hearings held in the Senate after the court's decision in *Oregon* v. *Mitchell, supra,* 400 U.S. 112, made clear what steps individual states might take to solve some of these administrative problems. Senate Report 92-26 recommends adoption of the Twenty-sixth Amendment as one way of precluding individual states from embarking on several programs of which the Judiciary Committee strongly disapproved. Significantly, programs which would force youths to vote by absentee ballot or otherwise single them out came in for severe condemnation: "*A few States are at least considering the possibility of . . . requiring them to vote either in centralized locations or by absentee ballot. But this type of alternative has fostered criticism on several grounds. At least one voting official has criticized this type of segregation of the younger voters because it would give them less of a sense of participation in the election system, and they should not be removed from the heart of the process. [¶] Moreover, forcing younger voters to undertake special burdens —obtaining absentee ballots, or traveling to one centralized location in each city, for example—in order to exercise their right to vote might well serve to dissuade them from participating in the election. This result, and the election procedures that create it, are at least inconsistent with the purpose of the Voting Rights Act, which sought to encourage greater political*

*participation on the part of the young; such segregation might even amount to a denial of their 14th Amendment right to equal protection of the laws in the exercise of the franchise.*" (1971 U.S. Code Cong. & Admin. News at pp. 374-375; italics added.)

It is clear that respondents have abridged petitioners' right to vote in precisely one of the ways that Congress sought to avoid—by singling minor voters out for special treatment and effectively making many of them vote by absentee ballot. The Senate Report indicates that Congress not only disapproved of such treatment, but feared that it would give youth "less of a sense of participation in the election system" and "might well serve to dissuade them from participating in the election," a result inconsistent with the goal of encouraging "greater political participation on the part of the young."

Respondents' policy would clearly frustrate youthful willingness to accomplish change at the local level through the political system. Whether a youth lives in Quincy, Berkeley, or Orange County, he will not be brought into the bosom of the political system by being told that he may not have a voice in the community in which he lives, but must instead vote wherever his parents live or may move to. Surely as well, such a system would give any group of voters less incentive "in devising responsible programs" in the town in which they live. Only the most dedicated partisan would travel from Oakland to San Diego (or Tucson) in order to exercise effectively his First Amendment rights of political association and expression.

America's youth entreated, pleaded for, demanded a voice in the governance of this nation. On campuses by the hundreds, at Lincoln's Monument by the hundreds of thousands, they voiced their frustration at their electoral impotence and their love of a country which they believed to be abandoning its ideals. Many more worked quietly and effectively within a system that gave them scant recognition. And in the land of Vietnam they lie as proof that death accords youth no protected status. Their struggle for recognition divided a nation against itself. Congress and more than three-fourths of the states have now determined in their wisdom that youth "shall have a new birth of freedom"—the franchise. Rights won at the cost of so much individual and societal suffering may not and shall not be curtailed on the basis of hoary fictions that these men and women are children tied to residential apron strings. Respondents' refusal to treat petitioners as adults for voting purposes violates the letter and spirit of the Twenty-sixth Amendment.

*California Law*: California law also compels respondents to treat citizens of 18 years of age or older as adults for all purposes related to voting.

Petitioners sought to register at addresses they claim to be their residences for voting purposes. If petitioners *are* residents of the districts they claim, the integrity of our state's political system demands that they be allowed to vote in those areas. This is true for two reasons.

First, basic democratic principles require that citizens be able to participate in making decisions that intimately affect their lives. Forcing residents of one locality to vote in the elections of another locality denies to those voters the right to help determine the resolution of issues which vitally affect them, and eventually alienates them from the political process.

■ Decisions of this court (e.g., *Castro* v. *State of California* (1970) 2 Cal.3d 223, 235-241 [85 Cal.Rptr. 20, 466 P.2d 244]) and the United States Supreme Court have made clear that *all* bona fide residents substantially affected by the outcome of an election and capable of voting intelligently and responsibly in it should be allowed to vote. As stated in *Kramer* v. *Union School District* (1969) 395 U.S. 621, 626-627 [23 L.Ed.2d 583, 589, 89 S.Ct. 1886], "Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives." (Fn. omitted.)

The rules announced by respondents not only would deny to some residents the right to vote where they live, but could also serve to give an unmarried minor a series of voting residences which he has never seen. The 18-year-old who lives and works in San Francisco for the three years he is a voting minor might well wind up voting in turn for the Mayor of Seattle, the Governor of Maine, and school bonds in Oshkosh, Wisconsin, only to be disenfranchised completely on the local level when his parents move permanently to Paris.

It may be objected that to allow unmarried minors to establish a domicile where they live may swell the rolls of college town electorates. It is contended that college students may "take over" a town by all voting the same way, that they are not "truly" residents in that many of them will move to other areas after they leave school, and that local governments have a legitimate interest in excluding such persons from the local polity.[7]

---

[7]The fear of a deluge is more theoretical than real. In Berkeley, for example, some 51,464 votes were cast in the recent municipal election. (Oakland Tribune, April 7, 1971.) Of 27,000 students at the University of California, no more than 9,000 (freshmen through juniors) are likely to be in the 18-20 age group. If typical registration percentages adhere, no more than 5,000-6,000 of these minors would register to vote. Even if every single one of these minors registered in Berkeley, which is highly un-

In many states special rules are applied in determining the voting residence of students. (Singer, *Student Power at the Polls* (1970) 31 Ohio St.L.J. 703, 721-723.) The underlying rationale of these various tests is that students are apt to be transient inhabitants of the community, little concerned about long-term policies and problems, and often may not pay local property taxes. (But see Note, *Restrictions on Student Voting: An Unconstitutional Anachronism?* (1970) 4 Mich.J.Law Reform 215.) The possible transiency, penury, or ignorance of students did not, however, impress the California Legislature, which has expressly provided that the law "shall not be construed to prevent a student at an institution of learning from qualifying as an elector in the locality where he resides while attending that institution, when in fact the student has abandoned his former residence." (Elec. Code, § 14283.) ▇ Student status is therefore a neutral fact in determining residence for voting purposes.

The Legislature has thus determined that differential treatment of students for voting purposes may not be condoned as a legitimate governmental policy. No reason appears for construing differential treatment of minors in a more favorable light.

The second major evil accomplished by allowing or forcing voters to vote in districts not their own is that voters of other districts have inflicted upon them a voter with no stake or interest in the outcome of the election. The extent of the evil is not only that residents of California would be asked to decide issues in Arizona or Hawaii. Small towns in California would be especially affected by such a rule, since the number of young people from the town who have left for other areas may be substantial in comparison to the town's total population. Allowing unmarried minors who reside elsewhere to vote may effectively turn a small town over to the control of unconcerned outsiders. Over a century ago we recognized the wisdom of requiring voters to be residents of the jurisdiction: "[C]itizens . . . should not deal with public questions through the ballot box until they at least [have] the benefit of an opportunity to learn the public wants, of concerting measures the best calculated to provide for them, and of selecting proper men to carry those measures into effect; . . ." (*Bourland* v. *Hildreth*, *supra*, 26 Cal. 161, 179.) Allowing minors to vote at fictional residences would compromise the integrity of the political process.

In addition to these fundamental policies requiring that a person vote where he actually resides and not be compelled to vote at a fictional resi-

---

likely, and even if every one then voted (which is more unlikely), the *vote* total would be increased no more than 10 percent, and the rolls an even lesser percentage. Nor, among this highly educated group, is it very probable that all 5,000 minors would vote the same way on any issue.

▇

dence, there are further legislative policies which require that a minor residing apart from his parents be permitted to vote at his residence.

Although our statutes provide for absentee registration as well as absentee voting (Elec. Code, § 213), it is likely that individuals forced to vote in elections they care and know little about will be inclined not to register or vote at all. While the rational man might register in one county as well as another for purposes of a presidential primary, why should he register or vote in any local election when he knows nothing of the issues or candidates? Forcing voters to register at fictional residences would therefore frustrate the legislative intent "to promote and encourage voter registrations . . . to the end that registration may be maintained at a high level." (Elec. Code, § 201.)

■ The provisions of the Elections Code governing determination of residence for voting purposes also reflect the state policy of recognizing an actual rather than a fictional residence.

Section 14282 provides the general standard for determining an individual's domicile for voting purposes. It provides: "The residence of a person is that place in which his habitation is fixed and to which, whenever he is absent, he has the intention of returning."[8]

■ The registrar obviously has the power not to register someone who is not a resident of the jurisdiction. But California law gives great weight to the voter's representation of where his domicile is. If a voter is challenged at the polls on the ground that he has not been a resident of the state, county, or precinct for a sufficient time, the precinct board may ask the voter only four questions. If the voter answers them with a "yes" or "no" which indicates he is a resident of the jurisdiction, the board must take his word for it and must allow him to vote. (Elec. Code, §§ 14243-14244.5.) Moreover, *"Any doubt in the interpretation of the law shall be resolved in favor of the challenged voter."* (Elec. Code, § 14255; italics added.)

Section 14282 would normally govern the determination of petitioners' domiciles for voting purposes. ■ Any presumption that a given class of persons are not residents of the place they live would contravene the spirit and text of the Elections Code. (Elec. Code, §§ 14255, 14282; see

___

[8]Sections 14280-14292, and the preceding sections 14240-14255, concern challenges to any voter at the polls by the precinct board appointed by the board of supervisors. Since challenges are based only on failure to possess qualifications set forth in the affidavit of registration, e.g., residence in the jurisdiction, it is clear that these same standards for determining residence apply as well to the registrar of voters.

also §§ 14283, 14290, allowing soldiers, students, inmates of institutions, and wives living apart from their husbands to acquire domiciles in the place they live.)

Respondents apparently do apply section 14282 in determining the residence of a married minor (who may be considered an adult for some purposes, but would still be a minor under state law for voting purposes; see Civ. Code, § 25). They appear to refuse as a matter of policy, however, to accept affidavits of residence from unmarried minors, unless the residence claimed is that of the parents. Even considering state law alone, this policy may be sustained, in light of the Elections Code, and the strong state policies discussed above, only if unmarried minors are generally incapable of having a domicile of their own. Subject to some unspecified objections, the Attorney General so believed (54 Adv.Ops.Cal.Atty.Gen., *supra,* at pp. 11-12), relying on Government Code, section 244, subdivisions (d) and (f), which provide that an unmarried minor's residence is that of his parents, and cannot be changed by his own act alone.[9]

The Attorney General has misapplied section 244 by failing to view it in light of other pertinent statutes and decisions governing parent-child relations. ▇ Specifically, under California law a minor may be emancipated partially or completely by his parents or by operation of law. It is possible that a minor of 18 years of age or older, living apart from his parents, will be emancipated for all purposes; it is substantially probable that he will be emancipated for purposes of residence; and the minor is necessarily emancipated for all purposes related to voting when he is given the vote in his own right, without regard to the consent of his parent or guardian. ▇ In light of this California law regarding the emancipation of minors, we conclude that minors over 18 years of age must be treated as adults for voting purposes, and the location of their domiciles may not be questioned on account of their age.

Although section 244 is couched in absolute terms, it has not been so applied. Our courts have long held, for example, that a minor's residence does not follow that of the parent when the parent has abandoned him. (*In re Vance* (1891) 92 Cal. 195, 198 [28 P. 229]; *In re Hawkins* (1920) 183 Cal. 568, 575 [192 P. 30]; *Guardianship of Brazeal* (1953) 117 Cal.

---

[9]Government Code, section 244, subdivision (d) provides: "The residence of the father during his life, and after his death the residence of the mother, while she remains unmarried, is the residence of the unmarried minor child, provided that when the parents are separated, the residence of the parent with whom an unmarried minor child maintains his place of abode is the residence of such unmarried minor child." Subdivision (f) further provides: "The residence of an unmarried minor who has a parent living cannot be changed by his own act."

App.2d 59, 61 [254 P.2d 886]; see also *Harlan* v. *Industrial Acc. Com.* (1924) 194 Cal. 352, 359-360 [228 P. 654].) Similarly, although section 244, subdivision (e) baldly states that "[t]he residence of the husband is the residence of the wife," the section has not been applied where the wife obviously maintained a separate domicile from that of her husband, to whom she was apparently happily married. (*Lowe* v. *Ruhlman* (1945) 67 Cal. App.2d 828, 833 [155 P.2d 671].)

Section 244's proviso that an unmarried minor's residence is that of his parents and cannot be changed by his own act must be construed in light of other statutes governing parent-child relations. In particular, Civil Code, section 211 provides in pertinent part: "The parent . . . may relinquish to the child the right of controlling him . . . ." Such relinquishment constitutes emancipation of the minor, and may be express or implied, complete or partial, conditional or absolute. (*Perkins* v. *Robertson* (1956) 140 Cal.App.2d 536, 540 [295 P.2d 972]; 67 C.J.S., Parent and Child, § 86.) The emancipated child "is in all respects his own man." (*Lackman* v. *Wood* (1864) 25 Cal. 147, 151.) To the extent he is emancipated he becomes *sui juris,* with the same independence as though he had attained majority. (67 C.J.S., Parent and Child, § 87; see, e.g., *Wadoz* v. *United Nat. Indemnity Co.* (1957) 274 Wis. 383 [80 N.W.2d 262, 265].) After consenting to the emancipation of a child old enough to work and care for himself, the parent has no right to custody or control. (*Ex Parte Clark* (1891) 87 Cal. 638, 642 [25 P. 967].) "A parent not entitled to the custody of a child has no right to control his residence." (*Harlan* v. *Industrial Acc. Com., supra,* 194 Cal. 352, 359-360; cf. Civ. Code, § 213.)[10]

Nor must a child be fully emancipated in order to acquire a domicile of choice. California law recognizes that emancipation for specific purposes is effective. (*Martinez* v. *Southern Pacific Co.* (1955) 45 Cal.2d 244, 253 [288 P.2d 868] [emancipation implied by circumstances]; *Slater* v. *California State Auto. Assn.* (1962) 200 Cal.App.2d 375 [19 Cal.Rptr. 290] [partial emancipation implied]; *Perkins* v. *Robertson, supra,* 140 Cal.

---

[10]The great preponderance of authority from other jurisdictions similarly holds that an emancipated minor, being *sui juris,* may acquire his own domicile. (See, e.g., *Bonneau* v. *Russell* (1952) 117 Vt. 134 [85 A.2d 569, 570]; *Cohen* v. *Delaware, Lack. & Western R.R. Co.* (1934) 150 Misc. 450 [269 N.Y.S. 667, 673-675]; *Bjornquist* v. *Boston & A. R. Co.* (1st Cir. 1918) 250 F. 929, 932-933; *Spurgeon* v. *Mission State Bank* (8th Cir. 1945) 151 F.2d 702, 705, cert. den. (1946) 327 U.S. 782 [90 L.Ed. 1009, 60 S.Ct. 682]; *Appelt* v. *Whitty* (7th Cir. 1961) 286 F.2d 135, 137; 28 C.J.S., Domicile, § 12, p. 21; Rest., Conflict of Laws, § 31; Rest.2d, Conflict of Laws, § 22.) As provided in Restatement Second of Conflict of Laws, section 22, comment f: "A parent has no power to control the domicil of an emancipated child. . . ."

App.2d 536 [partial emancipation implied]; *Argonaut Ins. Exchange* v. *Kates* (1955) 137 Cal.App.2d 158 [289 P.2d 801] [partial emancipation implied].) ██ As stated in *Cole* v. *Superior Court* (1915) 28 Cal. App. 1, 6 [151 P. 169], " 'the county of the husband's residence is [that] of the minor children, unless he has consented to their acquiring residence elsewhere, or has voluntarily relinquished his parental authority over them. . . .' "

██ Whether the minor has been emancipated for residential purposes is ordinarily a question of fact. (*Martinez* v. *Southern Pacific Co., supra,* 45 Cal.2d 244, 253.) ██ Establishment of a separate abode is evidence of emancipation. (*Spurgeon* v. *Mission State Bank, supra,* 151 F.2d 702; *Rounds Bros.* v. *McDaniel* (1909) 133 Ky. 669 [118 S.W. 956]; *Ream* v. *Watkins* (1858) 27 Mo. 516; see generally Annot., 165 A.L.R. 723, 740-742.)[11] In addition, it is common sense to believe that a good many minors over the age of 18 living apart from their parents *are* emancipated for these purposes. Eighteen is the age when most minors graduate from and leave school, when many get full time jobs and become self-supporting, when the state ceases to limit the number of hours they may work (Lab. Code, § 1172), when they may smoke cigarettes (Pen. Code, § 308), and when criminal proceedings begin to be brought in adult rather than juvenile courts. (Welf. & Inst. Code, § 604; Boches & Goldfarb, Cal. Juvenile Court Practice (Cont.Ed.Bar 1968) p. 35.) It is an age when males register for the draft and females may get married without the consent of either parent. (Civ. Code, § 4101.) A minor 18 to 21 years old who lives apart from his parents will usually consider his house to be home.

██ Not only is there a substantial likelihood that a minor over the age of 18 living apart from his parents has been emancipated for all purposes or at least for purposes of residence; it is also clear that when the minor is given the right to vote he is emancipated for all purposes relating to voting. Obviously, in giving the minor the right to vote, it was never contemplated that the parent or guardian should be able to control whether or not the minor should be permitted to vote or how he should exercise the franchise. It was necessarily the intention to accept him as a responsible member of the community, capable of participating in its political affairs, directing its policies, and choosing its leaders. For these purposes, he must be free en-

---

[11]In *Rounds Bros.* v. *McDaniel, supra,* 133 Ky. 669 [118 S.W. 956], in particular, the child left home *without* express parental consent. The court held that the parent's failure to object constituted an implied emancipation, which would become irrevocable if the parent's inaction continued. Similarly, even where the father gave the child money with which to leave, but thereafter exercised no control over the minor's activities, and the minor lived in another state, an emancipation had occurred. (*Johnson* v. *Gibson* (N.Y.C.P. 1855) 4 E. D. Smith's Rep. 231.) (Cf. *Grant* v. *Segawa* (1941) 44 Cal.App.2d Supp. 945, 949 [112 P.2d 784].)

tirely of parental control, and unless he is, the right to vote granted to him would be meaningless.[12]

The fundamental importance of the franchise, as both a symbol and a vital tool of our democracy, requires that every effort be made to apply uniform standards and procedures to all qualified voters equally. (Cf. 42 U.S.C. § 1971 (a)(2)(A).) ▮ In this case the strong likelihood that substantial numbers of voting minors living apart from their parents are emancipated for residential purposes, coupled with the necessity that minors given the vote be treated as emancipated for all purposes related to voting, persuades us that a minor 18 years of age or older must be treated as an adult for voting purposes, and that the location of his domicile may not be questioned on account of age or occupational status.

▮ We hold today that both the Twenty-sixth Amendment to the United States Constitution and California law require respondent registrars to treat all citizens 18 years of age or older alike for all purposes relating to voting. We do not imply that registrars may not question a citizen of any age as to his true domicile. However, the middle-aged person who obtains a job and moves to San Francisco from San Diego, and the youth who moves from his family home in Grass Valley to Turlock to attend college must be treated equally. Whether either of them acquires a new domicile or retains the old one is governed by sections 14280-14292 of the Elections Code. ▮ We hold only that registrars may not specially question the validity of an affiant's claim of domicile on account of his age or occupational status.

Let the peremptory writ of mandate issue directing respondent voting registrars to determine each individual petitioner's residence for voting purposes strictly in accordance with Elections Code, sections 14280-14292, and by the same standards, tests, and procedures as are applied to persons 21 years of age or older.

Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**WRIGHT, C. J.**—I concur in the majority opinion insofar as it is concluded therein that the places of residence of minor citizens of voting age are to be fixed in a like manner with the places of residence of adults, for purposes of determining the jurisdiction in which they are to vote. This result is

[12]Since the minor is emancipated for all purposes relating to voting, we have concluded that petitioners may sue in their own right, and that it would be improper for us to appoint a guardian ad litem pursuant to Code of Civil Procedure, sections 372-373, and Civil Code, section 42.

*compelled* by clear language of the Twenty-sixth Amendment which provides in pertinent part that the "right of citizens of the United States . . . to vote shall not be . . . abridged . . . by any State on account of age."[1]

It cannot be disputed that state-imposed restrictions which compel a minor of voting age to vote, if at all, only in the jurisdiction where his parents reside whatever his legitimate reasons for living apart from them, necessarily diminishes, curtails, reduces and accordingly abridges his right to vote *only on account of his minority*. The minor would thus be incapable of voting in the jurisdiction where he permanently and legally resides, while the adult is free not only to vote in such jurisdiction but to change the place where he votes when he changes his residence. No basis for justifying such an abridgment or discrimination on the right to vote, other than the minor's age or distinctions dependent thereon, has been suggested in the instant case. As the Twenty-sixth Amendment expressly prohibits the described state of conduct, we need not inquire further and to do so only emphasizes matters which should be of no concern to us.

There is no stronger statement of governing policy considerations in any particular circumstance than an express declaration embodied in our federal Constitution. Where, as here, such a declaration is manifestly dispositive of the single issue no good purpose is served by a concurrent examination of state or federal policies, or legislative histories, in an attempt to ascertain that the supreme law of the land must be adhered to because lesser policy considerations likewise require the same result.

Petitioners are entitled to their peremptory writ because the Constitution directs it, and we need and should not seek otherwise to justify such constitutional direction.

McComb, J., and Burke, J., concurred.

---

[1]The majority correctly and, for purposes of the decision herein, conclusively holds that the "Twenty-sixth Amendment prohibits abridging the right to vote on account of age. The word 'abridge' means diminish, curtail, deprive, cut off, reduce. [Citations.]"