[No. H006600. Sixth Dist. Jan. 30, 1991.]

STEVE HARTMAN, Plaintiff and Appellant, v.
PATRICIA M. KENYON, as City Clerk, etc., Defendant and
Respondent;
MARDI WORMHOUDT et al., Real Parties in Interest.

414

COUNSEL

Timothy J. Morgan for Plaintiff and Appellant.

Atchison & Anderson and John G. Barisone for Defendant and Respondent.

No appearance for Real Parties in Interest.

OPINION

COTTLE, J.—Recall proponent Steve Hartman sought a writ of mandate to compel Patricia Kenyon, City Clerk of the City of Santa Cruz (hereafter Clerk), to certify that three recall petitions he submitted contained the requisite number of signatures of eligible registered voters. When Hartman filed his petitions with the Clerk for examination, each contained more than the number of signatures required. However, after the Clerk completed her examination of the petitions, she determined that they were short of the required number by approximately 50 signatures. Because the Clerk had rejected approximately 120 signatures on each petition for irregularities in circulator declarations, Hartman sought leave of the Clerk to file amended circulator declarations. When the Clerk refused to accept them, Hartman filed a petition for writ of mandate. The trial court denied the petition, finding that the Clerk had no statutory authority to accept amended circulator declarations and that other signatures had been properly rejected. We affirm.

FACTS

All relevant dates are in 1989.

On February 13 and 14, Steve Hartman commenced recall proceedings by serving notices of intention to circulate a recall petition on three sitting

members of the Santa Cruz City Council, real parties in interest Mardi Wormhoudt, Jane Yokoyama and Don Lane. Hartman's statement of the reasons for the proposed recalls cited the council members' "recent vote to 'NOT' invite the United States Navy to join us in celebration of Independence Day, . . . a willful violation of [their] 'Oath[s] of Office'." Copies of the notices of intention, along with the requisite proofs of service, were filed with the Clerk's office on February 14 and 15.

On March 7, the Clerk advised Hartman that his proposed petitions contained a minor technical defect which would have to be corrected before he could circulate them. Hartman made the changes and submitted revised petitions the following day. On March 14, the Clerk notified him that the form and wording of the revised petitions met statutory requirements and that he could commence circulation of the recall petitions.

Hartman then had 120 days in which to submit his petitions with the requisite number of registered signatures. (Elec. Code,[1] § 27210, subd. (d).) That number was determined to be 6,541 for each petition, which represented 20 percent of the city's registered voters. (See § 27211, subd. (a)(3).) On the 120th day, July 12, Hartman submitted the 3 signed petitions to the Clerk's office. Because each contained prima facie more than the number of signatures required, the Clerk accepted the petitions for filing.

The Clerk then had 30 days in which to examine the petitions and from the records of registration ascertain whether or not they were signed by at least 6,541 eligible voters. There were over 7,000 signatures on each petition to be examined.

On August 8, the Clerk certified all three petitions as insufficient. On Yokoyama's recall petition, 6,485 of 7,201 signatures were found to be valid, on Lane's, 6,483 of 7,167, and on Wormhoudt's, 6,492 of 7,214. Thus, each recall petition was short of the 6,541 valid signatures required by about 50 signatures.

The Clerk disqualified approximately 200 signatures on each petition on the ground the signer's address on the petition differed from that shown on his voter registration affidavit. The Clerk also disqualified more than 120 signatures on each petition on grounds of circulator declaration problems, including circulators' failure to include dates, failure to sign declarations, and inclusion of circulation dates prior to approval of the form of the petitions by the Clerk.

---

[1] All further statutory references are to the Elections Code.

Hartman requested and was granted leave to examine the three petitions to determine which signatures were disqualified and for what reasons. (See § 27302.) Eighteen days later, he wrote to the Clerk requesting leave to file a number of amended circulator's declarations. Hartman hoped to cure technical defects which had caused the signatures in the accompanying petition sections to be invalidated. On September 1, the Clerk responded to Hartman's letter, stating she had no statutory authority to amend her earlier findings.

Hartman filed his writ petition on September 27 seeking to compel the Clerk to validate certain previously invalidated signatures and to certify the three petitions as sufficient. After a hearing, the court rendered its decision denying the petition.

STATUTORY SCHEME

Section 706 of the Santa Cruz City Charter provides that "the provisions of the Elections Code of the State of California . . . governing the . . . recall of municipal officers, shall apply in the City . . . ."

Under the Elections Code, the recall of a city council member is commenced by the service, filing and publication or posting of a notice of intention to circulate a recall petition. The notice of intention must: (1) identify the council member whose recall is sought and the proponent of the recall election (§ 27020); (2) be served on the council member; and (3) be filed in the city clerk's office within seven days, along with a proof of service (§ 27021). The council member may, at his option, file an answer (§ 27023).

The recall petition must expressly request that an election be called to determine whether the council member shall be removed from office and, if so, whether the subsequent vacancy on the council shall be filled by appointment or special election. (§ 27031.)

Where the council member does not file an answer, the proponent of the recall has only 17 days from the notice of intention to file two blank recall petitions with the city clerk. The clerk must then, within 10 days, ascertain whether the wording of the blank petitions meets statutory requirements. If corrections are required, the proponent has 10 days in which to make them. No signature may be affixed to a recall petition until the clerk notifies the proponent that the petition meets statutory requirements. (§ 27031.5)

Only registered voters may sign or circulate recall petitions. (§ 27035.) Signers must affix their signatures and print their name, residence address and city of residence on the petition (§ 27032), and circulators must sign a

declaration attesting to the fact the circulator actually circulated a particular section of the petition, that he saw the signers sign the petition, that to the best of his information and belief each signature is the genuine signature of the person whose name it purports to be, and that the signatures were collected between the dates the circulator set forth in the declaration. (§ 44.)

The signed recall petitions must be presented for filing in cities the size of Santa Cruz within 120 days of the clerk's notification that the petition's wording was proper. (§ 27210.) Only if the petitions prima facie contain the number of signatures required will the clerk accept the petitions for filing. (§ 27212.) The clerk then has 30 days to ascertain from the records of voter registration whether the petition was in fact signed by the requisite number of eligible registered voters. (§ 27214.) If the clerk determines that the petition is insufficient, the proponent of the petition may examine it in order to determine which signatures were disqualified and the reasons for disqualification. (§ 27302.)

## Discussion

This appeal presents two questions: first, whether a clerk must accept amended circulator declarations to correct technical defects in recall petitions and, second, whether the Supreme Court's opinion in *Walters* v. *Weed* (1988) 45 Cal.3d 1 [246 Cal.Rptr. 5, 752 P.2d 443] renders section 45 unconstitutional. An affirmative answer to either question would have the effect of validating previously invalidated signatures such that the recall petitions in this case would have attached to them the requisite number of signatures of eligible registered voters. We shall analyze each question, both issues of first impression, separately.

### A. Was the Clerk Required to Accept the Proffered Amended Circulator Declarations?

■ Hartman contends that the Clerk was required to accept the declarations based on a 1960 Attorney General's opinion which states, in pertinent part: "It is our opinion it would be an abuse of the authority apparently given him under section 1272 for the county superintendent to determine that recall petitions are insufficient on the basis of minor defects or irregularities in the affidavits of the circulator. See *Reites* v. *Wilkerson*, 95 Cal.App.2d 827, 829, 213 P.2d 773, 774 (1950) . . . . [¶] The proper procedure under the circumstances is to permit the circulator of the petition to amend his affidavit so that it complies with the law. *Reites* v. *Wilkerson*, 95 Cal.App.2d 827, 213 P.2d 773 (1950). When so amended the affidavit dates back to the time of the filing of the original. *Hinkley* v. *Wells*, 57 Cal.App.

206, 209, 206 Pac. 1023, 1025 (1922)." (36 Ops.Cal.Atty.Gen. 68, 69-70 (1960).)

We do not believe that either the Attorney General's opinion or the 1922 and 1950 cases upon which it relies can be read so broadly as to compel the Clerk to accept Hartman's proffered amended circulator declarations. The specific conclusion of the Attorney General opinion is that an irregularity in the affidavit of a petition circulator, "especially where [it] consists merely of the omission of an address which does not affect the validity of the petition itself and can easily be corrected" (36 Ops.Cal.Atty.Gen., *supra*, at pp. 68-69) will not invalidate the entire petition.

This conclusion was incorporated into the Secretary of State's Guidelines for Verifying Elections Petitions. Therein, the Secretary of State notes: "As a general rule, defects in the circulator's affidavit will not invalidate the signatures on the petition; however, see Item 15(b) [dealing with dates of execution or failure to give dates] for an exception to the general rule." The Secretary of State points out that the Clerk may verify signatures where the "Circulator's affidavit lists no address or only a post office box address." Thus, the guidelines distinguish between irregularities relating to dates on which the petition was circulated and other circulator affidavits irregularities.

We believe that this distinction is significant. The Attorney General opined that petitions should not be invalidated because of irregularities "not affect[ing] the validity of the petition itself." But where, as here, the declarations affirmatively demonstrate they were circulated outside the 120-day period set by the Legislature within which all signatures must be obtained, or where they fail to state they were circulated within the statutory period, then these "irregularities" affect the validity of the petition itself. If the signatures were not obtained within the 120-day window period, they may not be counted.

Hartman relies on language in the Attorney General's opinion to the effect that "the proper procedure [where the circulator failed to list his address] is to permit [him] to amend his affidavit so that it complies with the law." This language is based on *Reites* v. *Wilkerson* (1950) 95 Cal.App.2d 827 [213 P.2d 773], a case concerning the failure of petition circulators to certify the petitions in accordance with the provisions of the Los Angeles City Charter. The court pointed out that under the Los Angeles City Charter, a petition for recall found to be insufficient by the city clerk " 'may be amended by filing a supplemental petition or petitions within ten days from the date of such certificate.' " (*Id.*, at p. 829.)

In this case, in contrast, there is no provision allowing for the filing of supplemental petitions after a recall petition is found to be insufficient. The Santa Cruz City Charter does not contain such a provision; nor does the California Elections Code, which the City of Santa Cruz has adopted. At one time, the Elections Code allowed a recall proponent to "supplement [ ] [a petition found insufficient] within 10 days of the date of certificate by filing additional petition sections . . . ." (Former § 27214, amended by Stats. 1982, ch. 109, § 7 p. 328,.) However, in 1982, the Legislature made substantial changes to the Elections Code relating to recall elections and deleted all provisions affording a recall proponent the right to supplement an insufficient petition. (See generally, Stats. 1982, ch. 109, §§ 1-12 p. 325-329.)

■ "It is fundamental in statutory construction that courts should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] Moreover, they should construe every statute with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." (*Clean Air Constituency* v. *California State Air Resources Bd.* (1974) 11 Cal.3d 801, 813-814 [114 Cal.Rptr. 577, 523 P.2d 617].)

■ We view the Legislature's decision to eliminate supplemental petitions as an indication of their intent to bring finality, certainty and uniformity into the recall process. Either a recall proponent submits the requisite number of valid signatures within the statutory period—in which case the petition must be certified as sufficient—or he doesn't—in which case it must be certified as insufficient. ■ While we recognize that recall statutes should be construed liberally to enable citizens to exercise their rights of recall (*Moore* v. *City Council* (1966) 244 Cal.App.2d 892, 901 [53 Cal.Rptr. 603]), recognition of this policy "does not allow the courts to enlarge the scope of a procedural statute where the statutory provisions are clear." (*Wilcox* v. *Enstad* (1981) 122 Cal.App.3d 641, 651 [176 Cal.Rptr. 560].)

■ We conclude that the Clerk was without statutory authority to accept Hartman's proffered amended circulator declarations. Because of this conclusion, we need not address Hartman's further contention that once the Clerk accepted the declarations, her tasks would have been ministerial, without any right to adjudicate the truth or falsity of statements in the amended declarations. Finally, we find no merit in Hartman's contention that section 27302, affording a recall proponent the right to examine the petitions after a certification of insufficiency, confers on him a right to file amended petitions. The statute unambiguously states its purpose: to allow inspection "in order to determine which signatures were disqualified and the reasons therefor."

B. *Did the Clerk Violate the Supreme Court's Decision in Walters v. Weed When She Disqualified Signatures of Voters Whose Residence Addresses Were Different From Their Respective Addresses on Their Voter Registrations Affidavits?*

■ Hartman concedes that prior case law as well as section 45[2] and the Secretary of State's guidelines all call for the disqualification of signatures of voters who list a different address on a recall petition from the address they listed on their voter registration affidavits. However, Hartman contends that the Supreme Court's decision in *Walters* v. *Weed* makes application of these rules unconstitutional. He states, "There seems no question but that in view of the holding in *Walters* v. *Weed, supra,* each person whose signature was rejected by the city clerk on the basis of a discrepancy between the current residence address shown on the petition and the residence address shown on that person's voter registration affidavit would be entitled to vote from the address and precinct shown in the voter's respective affidavit of registration."

As we shall explain, we believe Hartman reads the *Walters* v. *Weed* opinion much too broadly. "[E]ach person whose signature was rejected by the City Clerk on the basis of a discrepancy between the current residence address shown on the petition and the residence address shown on that person's voter registration affidavit" would *not be entitled* "to vote from the address and precinct shown in the voter's respective affidavit of registration." The narrow opinion holds only that a person may vote in the precinct of his or her former domicile until a new domicile has been acquired.

*Walters* was an action by citizens to set aside a municipal election on the ground that certain University of California Santa Cruz students had voted illegally. The students had lived and registered to vote on the university campus. When they returned to school in the fall of 1983, however, "many were unable or chose not to live on campus. However, by the time voter registration closed, not all of these students had obtained off-campus housing where they intended to remain." (45 Cal.3d at p. 4.) The question the court was called upon to resolve was, " '*Where* were these students' " who were living, for example, "in the off-campus homes or apartments of friends, in cars parked in remote campus parking lots, or in tents pitched

---

[2] Section 45 provides, in pertinent part: "For purposes of verifying signatures on any . . . recall . . . petition or paper, the clerk shall determine that the residence address on the petition or paper is the same as the residence address on the affidavit of registration. If the addresses are different, or if the petition or paper does not specify the residence address, . . . the affected signature shall not be counted as valid. [¶] Any signature invalidated pursuant to this section shall not affect the validity of other valid signatures on the particular petition or paper."

under the campus redwoods" " 'domiciled for voting purposes when they resided at their temporary locations during the autumn of 1983?' " (*Id.*, at p. 11.)

At trial, some 292 student voters testified. Of these, 193 did not physically reside in the on-campus precincts. Of the 193 no longer residing on campus, the trial court found that most of them, 113, *had* acquired a new domicile as of one month before the election and had therefore voted illegally. (Because it would have taken 182 illegal votes to change the outcome of the election, however, the election results were upheld.) The remaining 80 students were residing in temporary quarters where they did not intend to remain. It was only with respect to these students that the court ruled as follows: "Our holding in this case is narrow in its scope. We hold that when a person leaves his or her domicile with the intention to abandon it, and when that person currently resides in a place in which he or she does not intend to remain, that person may vote in the precinct of his or her former domicile until a new domicile has been acquired." (45 Cal.3d at p. 14.)

Hartman contends that *Walters* stands for the proposition that a voter who has moved is always entitled to vote at his former precinct (unless a challenger proves by clear and convincing evidence that the voter abandoned his former domicile) and that since the right to vote is coextensive with the right to sign a recall petition, the Clerk erred in disqualifying signatures where the residence address differed from the address of the voter's registration affidavit. While we agree that legislation affording citizens a right to recall public officials is to be given the same liberal construction as that extended to election statutes generally (*Wilcox* v. *Enstad, supra,* 122 Cal.App.3d at p. 651), we disagree with Hartman's first premise: that a voter who has moved may automatically vote at his former precinct.

In *Walters,* there can be no doubt that the student voters announced that they resided on campus. Under section 14211, every person desiring to vote must announce his name and address in an audible tone of voice, and when one of the precinct officers finds the name in the index, the officer must, in like manner, repeat the name and address. After that, the voter must write his name and address in the roster of voters. If a voter is not a resident of the precinct, his or her vote may be challenged by a member of the precinct board or other official responsible for the conduct of the election. (§ 14216.) Thus the students, having announced that they resided on campus, prima facie appeared to be qualified electors. The burden to prove that they had voted in a precinct where they were not domiciled was on the challenger.

Here, in contrast, the recall petition signers whose signatures were rejected announced that their residence address was somewhere other than where

they had indicated on their voter registration affidavits. Had these petition signers gone to vote at their former precincts and had they announced their addresses as outside the precinct, their votes would have been challenged. The signers' decision to list their new addresses as their "residence address" is probative of their intent to make that new residence their "legal residence" or "domicile." (Cf. *Walters* v. *Weed, supra,* 45 Cal.3d at p. 7.) The students' decision, on the other hand, to list the university campus as their address is probative of the fact that many of them had not found another domicile.

Additionally, the *Walters* court, in issuing its narrow opinion, focused in on the special problems encountered by students: "Policy considerations also support the use of students' abandoned domiciles for voting purposes. Our adoption of the trial court's rule avoids disenfranchisement. Were we to adopt the holding of the Court of Appeal, anyone who moved from one domicile and had not yet established another would be left without a domicile and thus would be unable to vote anywhere during the period of travel. University students would be especially hard hit, as it is not uncommon for them to relocate at summer's beginning or end, precisely when voter registration periods close. In communities with large student populations and low vacancy rates, the student's search for a new domicile can be particularly exasperating—and time-consuming. Thus, under the Court of Appeal's holding, many students would be subject to disenfranchisement. Such a result is, in itself, intolerable; it also conflicts with our holding that no construction of an election law should be indulged that would disenfranchise any voter if the law is reasonably susceptible to any other meaning (*Otsuka* v. *Hite* (1966) 64 Cal.2d 596, 603-604 [parallel citation]), and it ignores our holding that students 18 years of age or older must be treated the same as other California residents for voter registration purposes (*Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565 [parallel citation ]).'' (45 Cal.3d at pp. 13-14.)

In summary, we find *Walters* inapposite. It held that one who, for voting purposes, announces that he resides at his former domicile, and who in fact has left that residence with the intent not to return, and who has not yet found another residence where he intends to remain, may vote in the precinct of the former residence. In Hartman's recall petitions, however, the signers whose signatures were rejected announced that they lived at a different address from that where they were last qualified to vote. The Clerk did not err in following the mandate of section 45 and disqualifying the signatures of signers who listed a different residence address on the petition from the address they listed on their voter registration affidavit.

The judgment is affirmed.

Agliano, P. J., and Premo, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 24, 1991.